510 S.E.2d 613 (1998)
235 Ga. App. 856
In the Interest of J.O.L., a child.
No. A98A2000.
Court of Appeals of Georgia.
December 30, 1998.
*614 Robert H. Baer, Brunswick, for appellant.
Steven L. Morgan, Brunswick, for appellee.
ANDREWS, Chief Judge.
The parents of J.O.L. appeal from the trial court's order terminating their parental rights in conjunction with a petition for adoption brought by the child's grandparents. Because the court's ruling was supported by clear and convincing evidence, we affirm.
The child, a boy born on October 8, 1996, was placed with his grandparents immediately after he was born. The child's mother is unmarried, and the biological father never filed a petition for legitimation. When the child was 17 months old, the grandparents filed a petition to adopt the boy. The parents objected to the petition, and after a hearing, the court terminated their parental rights and allowed the adoption petition to proceed. This appeal followed.
The standard of review on appeal from a termination of parental rights is whether, after reviewing the evidence in the light most favorable to the appellee, any rational trier of fact could have found by clear and convincing evidence that the natural parent's right to custody should be terminated. In the Interest of L.F., 203 Ga.App. 522, 417 S.E.2d 344 (1992). On appeal, "[t]his Court neither weighs evidence nor determines the credibility of witnesses; rather, we defer to the trial court's factfinding and affirm unless the appellate standard is not met." In the Interest of R.N., 224 Ga.App. 202, 480 S.E.2d 243 (1997).
At the termination hearing, a caseworker with the McIntosh County Department of Family & Children Services (DFACS) testified that the child was born prematurely, weighing only two pounds at birth. The mother, who was 18 at the time the baby was born, tested positive for drug use at the time of the baby's birth and had been hospitalized before the baby was born for severe depression and attempted suicide. The caseworker also testified that the mother's medical records showed not only suicidal, but also homicidal tendencies.
The baby was hospitalized for approximately one month after his birth, and DFACS took custody of the baby while he was still in the hospital. The caseworker said DFACS tried to work with the parents to make their home a safe place for the baby, but, neither parent had stable employment and they lived in a trailer with no electricity and holes that went through to the ground. The caseworkers were concerned because the baby would need adequate heating and would be on a heart monitor which would require electricity.
Caseworkers set up a case plan with the parents requiring the father to legitimate the child and requiring both parents to become drug- and alcohol-free and to participate in *615 drug screening. Neither parent went for the drug tests. The father admitted he had not filed a petition to legitimate the child.
The mother testified and claimed that she did take one drug test, but admitted that was all. In response to a question from the court, the mother said she did not take the drug tests because she was still using drugs until two and a half months before the hearing. The mother admitted she had not gone to counseling and had attended only one parenting class.
The mother also said the furnace was still not working in the trailer, but they did have a space heater. Although the judge at the initial custody hearing had asked her to look for a different job, the mother said she was still working as a nude dancer.
The mother stated that she was not ready to take care of the child at that time. She said that she would possibly be ready in "the next three to five, six months, yes."
"Pursuant to OCGA § 15-11-81(a), a... court deciding whether to terminate a parent's rights employs a two-prong test, first determining whether there is clear and convincing evidence of parental misconduct or inability." In the Interest of R.N., supra. A finding of parental misconduct or inability must rest on clear and convincing evidence showing: (1) the child is a deprived child as defined by OCGA § 15-11-2; (2) the lack of proper parental care or control by the parent in question is the cause of the child's status as deprived; (3) such cause of deprivation is likely to continue or will not likely be remedied; and (4) the continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child. OCGA § 15-11-81(b)(4)(A)(i), (ii), (iii), and (iv); In the Interest of R.N., supra. The Code defines a "deprived child" as "a child who: (A) Is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health or morals...." OCGA § 15-11-2(8)(A). If the first prong of the test is met, the trial court then considers whether termination of the parental rights is in the child's best interest. In the Interest of R.N., supra.
Here, there is no contention the child is not deprived or that the lack of parental care is the cause of the deprivation. The mother admits she cannot care for the child at this time. The mother also admits it will be some time in the future before she can care for the child. The mother does contend that the court erroneously found that the deprivation was likely to continue or would not likely be remedied. She claims she is willing to cooperate in a re-unification plan with the child.
In determining whether conditions of deprivation are likely to continue, the court may consider the past conduct of the parent. In the Interest of J.M.C., 201 Ga.App. 173, 174, 410 S.E.2d 368 (1991). In this case, there was not only evidence of past unfitness, there was present unfitness and the mother appeared unsure of how long it would be before she could care for the child. Both the mother and father admitted they did not comply with the case plan DFACS set up for them. In light of this and in light of the mother's own admission that she would be unable to care for the child for at least several months, there was sufficient clear and convincing evidence from which the trial court could conclude the deprivation was likely to continue.
In looking at the second prong of the test, whether termination is in the best interest of the child, the court may consider the child's need for a stable home environment and the detrimental effects of prolonged foster care. In the Interest of J.M.C., supra at 175, 410 S.E.2d 368. Children need permanence of home and emotional stability or they are likely to suffer serious emotional problems. In the Interest of T.R.G., 162 Ga.App. 177, 179, 290 S.E.2d 523 (1982). The court may also look at the same factors which show parental inability to care for the child to support a finding that termination of parental rights would be in the child's best interest. In the Interest of G.K.J., 187 Ga. App. 443, 444, 370 S.E.2d 490 (1988). These considerations, together with the mother's uncertainty as to when she would be able to care for the child, were sufficient clear and convincing evidence that termination was *616 also in the best interest of the child. In the Interest of J.M.C., supra; In the Interest of T.R.G., supra.
Judgment affirmed.
POPE, P.J., and RUFFIN, J., concur.