A99A2392, A99A2393. IN THE INTEREST OF B. R. W., a child
(two cases).
(530 SE2d 5)

RUFFIN, Judge.

On May 28, 1999, the juvenile court entered an order terminating the parental rights of Jane Watts and Robbie Ritchie, the natural parents of B. R. W. In Case No. A99A2392, Watts appeals the termination of her parental rights.[1] In Case No. A99A2393, Watts' mother, Mary Janet Carroll, contends that the trial court violated OCGA § 15-11-90 (a) by failing to place B. R. W. with her following termination of the natural parents' rights. For reasons discussed below, we affirm in both cases.

*Case No. A99A2392*

In March 1997, Watts was picked up by authorities after running away from home. She was 16 years old at the time. The Murray County Department of Family & Children Services (DFCS) was contacted because Watts indicated that she did not want to return to her mother and stepfather. She told DFCS that her stepfather had sexually abused her but did not provide details other than to say that he had pinched her on her legs. An investigation was conducted by the Gilmer County Department of Family & Children Services, which apparently found the charges unsubstantiated.

A few days later, Watts apparently ran away from her grandmother's home and was picked up in the company of Ritchie, an 18-year-old who had been twice convicted of theft by taking. They began a sexual relationship, and Watts became pregnant with B. R. W. In June 1997, Ritchie was arrested for forgery. He pled guilty and was incarcerated until April 1999. It appears that Watts was also arrested in connection with the forgery.

When Watts was four or five months pregnant, she was placed in DFCS' custody and began living with a foster family, the Beavers. Watts gave birth to B. R. W. in December 1997. B. R. W. was also placed in DFCS' custody and placed in foster care with the Beavers.[2] After the birth, Watts continued for a time to attend school and live with the Beavers. Around June 1998, however, against DFCS' recom-

---

[1] Ritchie does not appeal the termination of his parental rights.

[2] Although the trial court took judicial notice of all court files relating to Watts and B. R. W., the order placing B. R. W. in DFCS' custody is not in the record on appeal.

mendation, Watts decided to leave the foster home and return to live with her mother, while leaving B. R. W. to be raised by the Beavers. At that time, Watts told several people that she did not think B. R. W. should be placed in her mother's home.

DFCS prepared several case plans designed to reunify Watts and B. R. W. These case plans required Watts to contribute financially to the support of the child; to maintain a meaningful relationship with the child, including regular visitation; to cooperate with DFCS; to acquire nurturing and parenting skills, including the completion of a Better Beginnings program; and to obtain stable employment in order to provide a home for the child.[3]

Ruby Slack, Watts' DFCS case manager, testified that Watts called her several times in early 1999, telling her that she wanted to surrender her parental rights. They met in Slack's office, and Slack advised Watts to think more about it before surrendering her rights. Two or three weeks later, on February 16, Watts called back and said that she had thought about it and wanted to come in and sign her rights away. Watts came into the office that day, and Slack discussed the surrender papers with her, giving her a copy to study and making an appointment to sign the papers two days later. Watts did not show up for the appointment, however, and called Slack on February 23 to say that she had changed her mind. Later that day, Slack informed Watts and her mother that DFCS was going to request termination of parental rights. The decision to recommend termination was approved by the citizens review panel on March 10. The petition for termination was filed on April 16, 1999, and a hearing on the petition was held on May 18, 1999.

At the hearing, Slack testified that Watts was required under the case plans to make support payments of $10 per week. Watts began making such payments in July 1998 but did not make any payments after February 12, 1999, three months before the termination hearing. The total amount paid by Watts was $350.

Linda Moore, a teacher in the Better Beginnings program, testified that the program is designed to improve the parenting skills of teenage mothers. Under the program, a mother and her child would come together twice a week for four hours. Moore testified that a bus would be sent to pick up Watts and then B. R. W. According to Moore, when Watts first entered the program, she showed positive interaction with the child. Over time, however, "that began to diminish," and Moore said that it appeared Watts was losing interest in caring for the child. At one point, Watts "talked about giving up her rights with [the child] because she thought that [DFCS] would never give

---

[3] Copies of these case plans are not included in the record on appeal.

her child back and she thought it would be better that she just gave it up." Moore said that Watts eventually just stopped showing up for the program, without ever contacting her. At the termination hearing, Watts admitted that she had stopped attending the program around March 1999 and that she never informed her caseworker of that fact. She said one reason she stopped attending the program was because Slack had told her she was going to seek termination of parental rights. Watts testified that she attended four two-hour parenting classes at a church in Dalton but did not indicate exactly what those classes consisted of.

Slack testified that Watts did not contact her to arrange any visits with the child after the March 10 panel review. Ms. Beaver testified that, during the two months before the May 18 termination hearing, Watts visited the child only once. Watts stopped by the house on another occasion with a male companion but told Ms. Beaver that she had come to see her, not B. R. W. Beaver told Watts that she needed to get in touch with Slack to make arrangements to visit the child. Although Watts said she would, she never did. Watts admitted at the hearing that she stopped regularly visiting B. R. W. in early 1999, claiming she was never able to get hold of Slack to set up an appointment. Slack, however, testified that she had no contact with Watts after the March 10 panel review, except for one occasion when Watts left a message saying she could not show for a court date.

Ms. Beaver testified that she had ample opportunity to observe Watts' interaction with B. R. W. while they were living together. Although Watts appeared to love B. R. W., Beaver said "she just didn't seem to have the ability to discern, you know, certain things to make wise decisions in some circumstances." For example, Watts once tried to give her a bottle that was "extremely hot." Beaver testified that Watts resented it when she would try to teach her how to take care of the child. After Watts moved back in with her mother, she was allowed to keep B. R. W. for an overnight visit on at least one occasion. When B. R. W. was returned to Beaver, the child was "very upset, sort of agitated, cried a lot." On several occasions, Watts told Beaver that she did not think she was able to take care of B. R. W. and asked if the Beavers wanted to adopt the child. Watts' mother agreed that Watts did not have the maturity to raise B. R. W. and said that it would not be a good idea to let Watts keep the child by herself.

With respect to employment, Watts testified that she worked at Kentucky Fried Chicken for about a month, worked part-time for Hardee's for about six months, and then worked for McDonald's for about a month. After quitting the McDonald's job, she testified that she was unemployed for about a month. She testified at the hearing that she had been working the 11:00 p.m. to 7:00 a.m. shift at a dif-

ferent company, Beaulieu, for about a month. However, she never notified Slack that she had obtained this job. Watts testified that if B. R. W. were returned to her, a neighbor would take care of her while she was at work. However, she admitted that she had not discussed this with the neighbor and did not know whether the neighbor would agree to take care of the child.

After leaving the Beavers' home in spring 1998, Watts moved in with her mother, Carroll. According to Watts, Carroll would often tell her that she did not want Watts living with her anymore. However, Watts said "[s]he always said it out of anger, but she didn't mean it." Every two weeks, Watts would go to stay with her father for a few days in Copperhill, Tennessee. Around December 1998, Watts said she stayed for about two weeks with a friend in Cleveland, Tennessee. Watts testified at the hearing that she was buying a trailer and had been living by herself for the past month. However, she could not give an address and did not know the name of the person from whom she was buying the trailer. Slack testified that Watts did not keep her informed of her whereabouts. She said Watts told her that she "went back and forth" to Cleveland to stay with a friend but that Watts would not identify the friend. Slack said Watts never informed her that she was buying a trailer.

1. In her first enumeration, Watts contends that DFCS prematurely filed its termination petition. Watts relies on OCGA § 15-11-41 (n), which requires DFCS, subject to certain exceptions, to seek termination if a child has been in foster care under DFCS' responsibility for 15 of the most recent 22 months. Because Watts moved out of the Beavers' home less than 15 months before the petition was filed, Watts argues that the petition was premature. This contention is without merit, however, as OCGA § 15-11-41 (n) does not limit DFCS' ability to seek termination but simply *requires* it to seek termination under certain circumstances. Moreover, although Watts lived with B. R. W. in the Beavers' foster home for a period of time, DFCS has had custody of B. R. W. since her birth in December 1997, more than 15 months before the filing of the termination petition.

2. In two enumerations, Watts contends the evidence was insufficient to support the termination.[4] In considering this issue, we view

---

[4] We note that the trial court took judicial notice of all previous findings and orders relating to B. R. W., including reports of the citizens review panel's reviews and orders incorporating the panel's recommendations. It appears, however, that all of these documents have not been included in the record on appeal. In *In the Interest of M. L. P.*, 236 Ga. App. 504, 510-511 (2) (512 SE2d 652) (1999), we held that OCGA § 15-11-33 (d) permits a trial court in a termination action to rely on findings of a citizens review panel "to the extent of [their] probative value." In the absence of these documents, we cannot say whether they would provide additional support for the juvenile court's decision to terminate parental rights. It is at least arguable that the absence of these documents would prevent us from

the evidence in the light most favorable to the lower court's judgment to determine whether any rational trier of fact could have found by clear and convincing evidence that Watts' parental rights have been lost. We neither weigh the evidence nor determine the credibility of witnesses but defer to the trial court's factfinding and affirm unless the appellate standard is not met.[5]

A juvenile court must employ a two-step procedure before terminating a parent's rights:

> First, the court shall determine whether there is present clear and convincing evidence of parental misconduct or inability as provided by OCGA § 15-11-81 (b). Secondly, if there is clear and convincing evidence of such parental misconduct or inability, the court shall then consider whether termination of parental rights is in the best interest of the child. Parental misconduct or inability is found where (1) the child is deprived, (2) the lack of proper parental care or control by the parent in question is the cause of the child's deprivation, (3) the cause of deprivation is likely to continue or will not likely be remedied, and (4) the continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child. OCGA § 15-11-81 (b) (4) (A).[6]

A child is deprived if she is "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for [her] physical, mental, or emotional health or morals."[7] The evidence in this case clearly authorized a finding that B. R. W. was deprived and that lack of proper parental care or control by Watts was the cause of her deprivation. Since she was born, B. R. W. has been in foster care, and Watts has never acted as the child's primary caretaker. Although Watts had the opportunity to participate in B. R. W.'s care after the child was born, she voluntarily separated herself from her child by moving out of the Beavers' home, against DFCS' advice. Thus, B. R. W.'s lack of parental care is largely due to Watts' own decision to leave the child with the Beavers.

In addition, there was evidence that Watts seemed indifferent to the child during their sessions at Better Beginnings. On more than

---

reversing the juvenile court's decision on the grounds of insufficient evidence. As discussed below, however, the evidence actually introduced at the hearing was sufficient to support the court's decision, so it is not necessary to consider the effect of the absence of these documents.

[5] *In the Interest of C. J. V.*, 236 Ga. App. 770, 771 (513 SE2d 513) (1999).

[6] (Punctuation omitted.) Id.

[7] OCGA § 15-11-2 (8) (A).

one occasion, Watts indicated that she was unable to care for the child and desired to surrender her parental rights. In the months before the termination hearing, Watts admittedly failed to stay in contact with her child. Under all of these circumstances, the juvenile court was authorized to find that B. R. W. was deprived and that lack of proper parental care or control by Watts was the cause of the deprivation.

The evidence was also sufficient to allow the juvenile court to find that the cause of B. R. W.'s deprivation was likely to continue or would not likely be remedied and that continued deprivation would likely cause serious harm to the child. Since B. R. W. has been in foster care, Watts has displayed an on-again, off-again interest in parenting. Although Watts had the opportunity to help raise B. R. W. while living in the Beavers' home, she elected to move out, leaving the child to be raised by the Beavers. Watts' own mother testified that Watts did not have the maturity to raise B. R. W. As discussed above, Watts has indicated on several occasions that she does not believe she is able to raise the child and has often expressed a desire to surrender her parental rights. Although she claims to have changed her mind, her conduct after making such declarations does not demonstrate a commitment to parenting. To the contrary, Watts' interest in the child appeared to diminish in the months before the termination hearing.

"Judging the credibility of [Watts'] good intentions was a task for the juvenile court. The decision as to a child's future must rest on more than positive promises which are contrary to negative past fact."[8] The juvenile court was authorized to find that Watts lacked the requisite maturity and commitment to care for the child.[9] In addition, as the court noted, Watts has never established a stable home or stable employment. In short, the evidence authorized the juvenile court to conclude that Watts did not have the maturity, the inclination, nor the ability to provide the proper parental care and control necessary for B. R. W.'s physical, mental and emotional health and that these conditions were likely to continue for the foreseeable future.[10] The court was also authorized to consider "the adverse

---

[8] (Punctuation omitted.) *In the Interest of C. D. P.*, 238 Ga. App. 393, 395 (519 SE2d 37) (1999).

[9] See *M. L. P.*, supra at 509 (1) (c).

[10] See *In the Interest of T. R. G.*, 162 Ga. App. 177, 179 (290 SE2d 523) (1982); see also *In the Interest of K. C. O.*, 142 Ga. App. 216, 218 (235 SE2d 602) (1977) (mother had periods where she lost interest in parenting, had history of running away from home and of inability to establish stable home, was unwilling or unable to return to school or find employment, had originally expressed interest in placing child for adoption, and never established stable home environment or child care plan to allow child to be returned to her custody); *In the Interest of C. L. R.*, 232 Ga. App. 134, 138 (501 SE2d 296) (1998) (evidence showed mother's

effects of prolonged foster care in determining that continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to [B. R. W.]"[11]

With respect to the final element, "[t]he same factors which show a parent's inability to properly raise her [child] may also provide proof that termination of parental rights would be in the [child's] best interests."[12] In addition, the juvenile court properly considered B. R. W.'s "need for a secure and stable home."[13] In light of B. R. W.'s age and the unlikelihood of Watts being able to properly care for her in the foreseeable future, the juvenile court was authorized to conclude that termination was in the child's best interest.

### Case No. A99A2393

Two weeks before DFCS filed its termination petition, B. R. W.'s grandmother, Carroll, filed a petition to modify custody, asking that custody of the child be transferred to her. Although the custody and termination actions were given separate case numbers, the juvenile court considered them both at the May 18 hearing. Carroll's attorney was allowed to cross-examine all witnesses in the termination action and then to present evidence in support of her modification petition. The trial court addressed both petitions in its written order, first denying Carroll's petition to modify custody and then granting DFCS' petition to terminate parental rights. The court then found that there was no suitable family member to take custody of the child and therefore granted custody to DFCS. Carroll contests various aspects of the trial court's rulings.

3. In two enumerations, Carroll contends that the juvenile court erred in failing to properly follow OCGA § 15-11-90 (a). This statute provides that

> [i]f, upon the entering of an order terminating the parental rights of a parent, there is no parent having parental rights, the court shall first attempt to place the child with the child's extended family or with a person related to the child by blood or marriage. An exhaustive and thorough search for a suitable family member shall be made by the court and the

---

"unwillingness or inability to care for her child to the child's physical, mental and emotional detriment").

[11] *In the Interest of R. M.*, 232 Ga. App. 727, 728-729 (503 SE2d 635) (1998). See also *In the Interest of J. O. L.*, 235 Ga. App. 856, 858 (510 SE2d 613) (1998) ("Children need permanence of home and emotional stability or they are likely to suffer serious emotional problems").

[12] *In the Interest of S. J. C.*, 234 Ga. App. 491, 494 (1) (507 SE2d 226) (1998).

[13] OCGA § 15-11-81 (a).

Department of Human Resources in attempting to effect this placement. A placement effected under this paragraph shall be conditioned upon the family member who is given permanent custody or who is granted an adoption of the child agreeing to abide by the terms and conditions of the order of the court. A placement shall be made under the terms of this paragraph only if such a placement is in the best interest of the child.[14]

Carroll makes two separate arguments with respect to this statute. First, she argues that DFCS did not conduct a thorough search for suitable family members who could take custody of the child. Second, she argues that the trial court should have awarded her custody pursuant to the statute following termination of the natural parents' rights.

With respect to the first contention, Carroll does not argue that the alleged failure to conduct a thorough search in any way jeopardized her own ability to seek custody or prevented the court from adequately considering her as a candidate for custody. Indeed, the court allowed Carroll to participate fully in the hearing and to present evidence of her fitness.[15] To the extent that Carroll is simply arguing that DFCS should have conducted a broader search for other family members, she has not shown how she has the right to raise this issue on appeal, as she is neither the parent nor the guardian of the child on whose behalf such search is to be conducted.[16] Only a party who is aggrieved by a judgment has the right to appeal that judgment.[17] A party is "aggrieved" by a judgment if the judgment "operates on his rights of property, or bears directly upon his interest."[18] It seems clear, therefore, that Carroll, whose claim to custody

---

[14] OCGA § 15-11-90 (a) (1). The language of the statute was slightly modified effective July 1, 1999. See Ga. L. 1999, p. 252, § 2.

[15] See *C. L. R.*, supra at 139 (3) (rejecting mother's claim that court did not consider relative placement, where court heard evidence regarding option of placing child with paternal grandmother).

[16] In *In the Interest of S. B.*, 237 Ga. App. 692, 695-696 (515 SE2d 209) (1999), we held that a father lacked standing to assert that the mother's rights were violated by the failure to place the child with her relatives. In the subsequent case of *In the Interest of N. B.*, 239 Ga. App. 336 (521 SE2d 47) (1999), however, we agreed with the mother's assertion that the trial court and the Department of Human Resources did not adequately investigate the child's paternal grandfather as a possible candidate for placement. Although these cases appear to conflict as to the scope of a *parent's* right to complain about the failure to consider relative placement, neither case suggests that any relative other than a parent has the right to raise such issue — particularly a relative whose own merits have in fact been considered.

[17] See *Johnson v. Pulaski County Bd. of Ed.*, 231 Ga. App. 576, 578 (3) (499 SE2d 345) (1998).

[18] (Punctuation omitted.) *Southwire Co. v. Hull*, 212 Ga. App. 131, 132 (441 SE2d 293) (1994).

was in fact considered by the juvenile court, has no right to complain on appeal that DFCS and the court failed to conduct a thorough search for other family members.

With respect to the second issue — whether OCGA § 15-11-90 (a) required the juvenile court to award custody to Carroll following termination of the natural parents' rights — we are aware of no cases holding that a relative other than a parent has the right to appeal a termination order on the ground that the trial court failed to award such relative custody pursuant to OCGA § 15-11-90 (a).[19] Nevertheless, even assuming that Carroll has the right to raise this issue on appeal, the trial court did not abuse its discretion in failing to award custody to Carroll following termination of parental rights.

OCGA § 15-11-90 (a) does not require a trial court to give preference to family members in making a placement of a child following termination of parental rights. Rather, the statute states that "[a] placement shall be made under the terms of this paragraph only if such a placement is in the best interest of the child."[20] In this case, there was evidence to support the trial court's determination that it was not in the child's best interest to be placed with Carroll. There was evidence that Carroll and her daughter, Watts, had a stormy relationship and that Watts ran away from home on at least one occasion. At one point, Carroll's mother told Carroll that she had seen Watts "sniffing gas," but Carroll testified that she "didn't want to take [her] mother's word at that time." After ignoring this warning, Carroll personally observed Watts sniffing gas and had to take her to the emergency room.

After Watts left the Beavers' foster home, she expressed her belief that B. R. W. should not come to live in Carroll's household. The DFCS caseworker, Slack, testified that she had recently performed an inspection of Carroll's mobile home and that it was not fit for a young child to live there. She testified that there were exposed electrical wires in the room where B. R. W. was to stay, as well as a kerosene heater in a corner of the home. There were no screens on the doors or windows, and flies were in the home. When Slack asked Carroll for references, Carroll refused to give the names of any neighbors. When questioned about who would take care of B. R. W. while Carroll was at work, Carroll responded, "Well, I asked my brother to ask his girlfriend's grandmother to watch her, so I've got to get back

---

[19] In several cases, we have considered claims by the child's natural parent, whose rights had been terminated, that the trial court failed to consider relative placement. See C. L. R., supra; In the Interest of M. R., 213 Ga. App. 460, 466-467 (3) (444 SE2d 866) (1994); In the Interest of D. T., 221 Ga. App. 328, 330 (2) (471 SE2d 281) (1996); N. B., supra; S. B., supra.

[20] OCGA § 15-11-90 (a) (1).

with her tonight and find out what the verdict is on that." Under all of the circumstances, we cannot say that the trial court abused its discretion in determining that it was not in the child's best interest to be placed with Carroll.[21]

4. In her final enumeration, Carroll contends that the trial court erred in allowing DFCS' attorney, over objection, to ask a leading question regarding DFCS' attempts to find a suitable relative for placement. The question was as follows: "Have you done an exhaustive search to determine whether or not there are any other appropriate family members?" Pretermitting whether such question was in fact leading, the witness did not answer the question asked but simply described the efforts undertaken by DFCS. Therefore, Carroll has not shown any harm from the overruling of her objection.[22]

*Judgment affirmed. Andrews, P. J., and Ellington, J., concur.*

DECIDED FEBRUARY 3, 2000 — ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*James E. Wilbanks*, for appellant (case no. A99A2392).

*Avrett, Ponder & Withrock, William B. Barnwell*, for appellant (case no. A99A2393).

*Thurbert E. Baker, Attorney General, Dennis R. Dunn, Deputy Attorney General, William C. Joy, Senior Assistant Attorney General, Shalen A. Sgrosso, Laura W. Hyman, Assistant Attorneys General, Waycaster, Morris, Johnson & Dean, Cynthia N. Johnson*, for appellee.

---

[21] See *M. R.*, supra; *C. L. R.*, supra.

[22] See *English v. State*, 234 Ga. 602, 603-604 (2) (216 SE2d 851) (1975) (no reversible error unless appellant shows prejudice and injury from overruling of objection to leading question).