A00A2259, A00A2260. IN THE INTEREST OF S. K. et al., children (two cases).
(545 SE2d 674)

POPE, Presiding Judge.

The mother of S. K. and F. K. appeals following the termination of her parental rights. In a companion case, the children's paternal grandmother appeals from the juvenile court's order denying her custody of the children.

On appeal, we review the evidence in the light most favorable to the juvenile court's order. See *In the Interest of D. W.*, 235 Ga. App. 281 (509 SE2d 345) (1998). Viewed in that light, the evidence at the hearings showed that before April 1996, S. K. and F. K. lived primarily with their grandmother, with their parents' consent, although the grandmother was never granted legal custody by any court. The children's parents also periodically lived with the grandmother.

As early as 1990, the Department of Family & Children Services

---

began receiving reports of neglect and abuse regarding S. K. and F. K. and three other children who also lived with the grandmother. At one point, the children were removed from the grandmother's home because she failed to send them to school. In April 1996, all five children were placed in foster care after it was reported that S. K. and F. K. and two female cousins had been sexually abused by three male relatives, who either lived with the grandmother or had access to her home. One of the men was the father of S. K. and F. K., and another was the father of the other girls. The three men were subsequently charged in connection with the abuse. They either pled guilty or were convicted and were incarcerated at the time of the termination proceedings.

During DFACS' investigation of the allegations of abuse, S. K. and the two cousins stated that they had been sexually abused while they lived with the grandmother and that the mother and the grandmother were aware of the abuse, but did nothing to prevent it. The children also expressed fear that if they were returned to the grandmother's house, they would "get whippings" with extension cords and boards for talking with DFACS. A physician, who examined the children, found evidence that they had been sexually molested. After a finding of deprivation, S. K. and F. K. and their two cousins were removed from the grandmother's home and placed in DFACS' temporary legal custody. Even after the children were placed in DFACS' custody and the men incarcerated, the grandmother and the mother maintained that no abuse had occurred.

Thereafter DFACS developed a series of case plans designed to bring about the children's reunification with their family. The grandmother was included in the case plans because she had been the children's primary caretaker. The principal goal of the case plan was to get the mother and the grandmother to acknowledge that the abuse occurred and to recognize the importance of protecting them from further abuse. Despite these efforts, the grandmother and the mother never admitted that the children had ever been abused or neglected or that they needed protection. Up until the most recent hearings on the petition for termination, the grandmother also maintained that she would allow the girls' father to come back into her home once he was released from prison.

And during visitation sessions with the children, the mother and the grandmother told the children that the men had been "set up" and that the allegations of abuse were not true. They blamed the men's imprisonment on lies told by the cousins. Such discussions were prohibited by the juvenile court's order of August 26, 1997. They also discussed inappropriate things in front of the girls, such as a 15-year-old cousin's improper relationship with a 50-year-old woman, in violation of the case plan. In addition, they repeatedly

talked about the possibility of S. K. and F. K. returning to the grandmother's house, which confused the girls and violated the terms of the case plan. And at one point, they forwarded to the girls a note from their father, while he was awaiting trial on charges of molesting their cousin.

In June 1998, DFACS filed proceedings to terminate the mother's and the father's parental rights to S. K. and F. K. Following a number of hearings, the juvenile court terminated the father's parental rights. And although the court found clear and convincing evidence to terminate the mother's parental rights, it decided not to do so at that time because of the "strong family bond" between the children and their mother. Nevertheless, the children remained in DFACS' custody.

In July 1999, DFACS again sought to terminate the mother's parental rights. The juvenile court conducted hearings on September 17 and 22, 1999, on November 29, 1999, and on February 4, 2000. Rhonda Wheeler, the DFACS caseworker assigned to the children's case from 1996 to 1998, testified that while the children appeared to have a bond with the mother and the grandmother, they had told her several times that they did not want to live with the grandmother because "they would get hurt." She stated that on at least one occasion they had exhibited behavioral problems in school and at home following visits with the mother and the grandmother. She also stated that the children had been in several foster placements during the period she worked on the case.

Delicia Folsom, the children's current caseworker, testified that the tenor of the children's visits with the mother and the grandmother had deteriorated over the more recent visits, becoming, in her opinion, "more harmful." The children had told her that although they would like to return to the grandmother's house, they did not feel safe there. Folsom also noted that DFACS had investigated the possibility of placing the children with a relative for adoption, but the relatives identified by the family had been denied following criminal background checks. She stated that a prospective adoptive placement had been found for the girls with their former foster parents, who had moved to Texas. Both caseworkers opined that the children needed permanency in a safe, stable environment as soon as possible.

Dr. Wallace Kennedy, a clinical psychologist, conducted psychological evaluations of both the mother and the grandmother "to determine their suitability to be custodial parents of two young girls." Based on this evaluation, Dr. Kennedy determined that the mother was "mildly retarded" and functionally illiterate, which stunted her emotional and mental maturity and inhibited her ability to make proper decisions. He described her as a "child." He stated that these qualities made the mother very dependent upon the grandmother.

Kennedy believed that the mother was incapable of protecting the children if they were subjected to the same conditions that previously existed in the grandmother's home. And he believed that the mother had a "character disorder" that interfered with her ability to use good judgment and thus to parent S. K. and F. K.

Dr. Kennedy also determined that the grandmother was limited in intelligence and illiterate. Although the grandmother had a desire to care for the children, Dr. Kennedy found her to be "incredibly naive with regard to what that involves." He concluded that she had a character flaw or deficiency that caused her to operate on a fixed "belief system without much testing of reality."

Although Dr. Kennedy had evaluated the women several years prior to the hearing, he testified that he did not believe their condition would have changed in the intervening time. He stated that the condition of both women was "characterological" and not treatable, that counseling would have little or no effect on their conditions, and that he did not foresee any potential for improvement. He did not believe that either the mother or the grandmother had sufficient judgment and understanding to parent or protect the children, nor that they would ever develop those abilities. And he did not believe that the children should be returned to the care of the grandmother or the mother because they had "never faced the issue that terrible, terrible things have happened to the children." He also expressed concern that if the children were returned to the care of the grandmother or the mother, they would be "brainwashed into thinking that their perception of the abuse was a lie," which would be harmful to them.

A second clinical psychologist, Dr. Julie Christine Medlin, testified that she conducted psychosexual evaluations of S. K. and F. K. in June 1999 to assess their treatment needs and their current psychological functioning. Both children told Dr. Medlin that they had been sexually abused by their father and uncle, while they lived at the grandmother's house. Both girls also stated that their mother was aware of the abuse, but did nothing about it. Dr. Medlin administered a series of psychological tests, which supported the girls' statements that they had been sexually abused. Among other things, these tests showed that both girls were more depressed, had more social problems, and showed more sexual behaviors than the vast majority of girls their age. Dr. Medlin concluded that S. K. was severely traumatized by the sexual abuse and diagnosed her as having posttraumatic stress disorder, a condition which results from major trauma. Dr. Medlin also testified that while F. K. was not as severely traumatized as S. K., she suffers from adjustment disorder with depressed mood, and some symptoms of posttraumatic stress disorder. In addition to the sexual abuse, Dr. Medlin stated that the girls had been harmed

by the grandmother's and the mother's denial that the abuse had occurred and the continued impermanence of their situation. She stated that continued visitation with the mother and the grandmother would be harmful and that the girls needed a permanent adoptive home.

Dane Heard testified that following a home evaluation of the grandmother's home, he would recommend against placing the children with the grandmother. He based his conclusion on the fact that the grandmother and her husband both had health problems; that no one in the home was employed and they all received disability benefits; that they had very little excess income per month; and that because the grandmother intended to allow the children's father back into the home when he was released from prison, the children would not be safe. In addition, the children's guardian ad litem testified that he did not believe it would be in the children's best interests to be placed in the grandmother's care.

## Case No. A00A2259

1. As her sole enumeration,[1] the mother asserts that the trial court abused its discretion when it denied her oral motion for an independent psychological examination of the children. The mother's attorney made this motion at the September 22, 1999 hearing. The grandmother's counsel joined in the motion and further requested that another psychological examination be conducted on both the mother and the grandmother as well. The juvenile court deferred ruling on the motions, but directed that attorneys for the grandmother and the mother provide the name of a clinical psychologist or other professional who could perform the evaluations. At the next hearing, after citing evidence from the prior hearings including the testimony of the two clinical psychologists, the juvenile court denied the motions.

The mother contends that this ruling was an abuse of discretion pursuant to OCGA § 15-11-22,[2] which requires the juvenile court to issue a subpoena upon application of any party. But that section does not apply to the mother's motion. Rather, at the time of the motion, OCGA §§ 15-11-32[3] and 15-11-87,[4] which authorize a juvenile court to order a psychological examination, were the applicable sections.

---

[1] Because the mother asserts no error in regard to the merits of the trial court's termination order, we do not address that issue.

[2] Pursuant to amendment, this Code section has been redesignated as OCGA § 15-11-36 effective July 1, 2000.

[3] That Code section was redesignated as OCGA § 15-11-12 pursuant to the 2000 amendment.

[4] Now designated as OCGA § 15-11-100.

Under the language of both Code sections, the decision to order a mental evaluation is left to the juvenile court's discretion. Accordingly, we will not interfere with that decision absent an abuse of discretion. See generally *Williams v. Newsome*, 254 Ga. 714, 716 (334 SE2d 171) (1985) (the denial of a motion for appointment of an expert witness lies "within the sound discretion of the trial court and will not be overturned on appeal unless there has been an abuse of discretion").

In this case, the children had been examined by Dr. Medlin in June 1999, just a few months prior to the hearing. Based upon her examination, Dr. Medlin concluded that both children had been substantially harmed by the sexual abuse and by the mother's continued denial that any abuse had occurred. She further testified that it was in the children's best interests to place them in a permanent home and supported the termination of the mother's parental rights. The mother presented no evidence that Dr. Medlin's conclusions were in any way biased or that another psychologist would come to a different conclusion. Indeed, another psychologist, Dr. Carrie Pagels, had presented substantially similar testimony in the 1998 termination proceedings. Under these circumstances, we find no abuse of discretion.

### Case No. A00A2260

2. The grandmother asserts three errors with regard to the proceedings below. As an initial matter, we note that we make no determination as to whether a grandmother who was never granted formal legal custody of the children may bring an appeal from an order terminating the mother's parental rights and granting custody to DFACS. See *In the Interest of B. R. W.*, 242 Ga. App. 232, 240 (3) (530 SE2d 5) (2000). Cf. *In the Interest of J. C. H.*, 224 Ga. App. 708, 710 (2) (482 SE2d 707) (1997). Here, because the parents had apparently placed the children in the grandmother's care and the girls had lived with her almost all their lives, she was included in all DFACS case plans and was allowed visitation. She was served with pleadings, represented by counsel, and presented evidence in the juvenile court proceedings. But, even assuming the grandmother has the right to appeal under these circumstances, we find no error by the juvenile court.

The grandmother first asserts that the November 29, 1999 hearing was not recorded as required by OCGA § 15-11-28 (b).[5] That section provides that unless waived by the juvenile or the parents, "the proceedings shall be recorded by stenographic notes or by electronic,

---

[5] Now designated as OCGA § 15-11-41 (b).

mechanical, or other appropriate means." For some reason, here, the tape recording of one session was difficult to hear, and the court reporter was unable to prepare a complete transcript of the hearing. The grandmother contends that she is, therefore, entitled to a new hearing.

In prior cases, in the absence of a waiver, this Court has granted a new hearing on the ground either that the juvenile court failed to record the entire proceedings or that the record had been destroyed. See *In the Interest of L. G.*, 230 Ga. App. 153, 154 (495 SE2d 628) (1998) (only tape recording of deprivation proceeding destroyed); *In the Interest of T. M. C.*, 206 Ga. App. 595 (426 SE2d 247) (1992) (juvenile court was aware that a portion of the custody proceedings had not been recorded, but took no steps to remedy the situation); *In re R. L. M.*, 171 Ga. App. 940, 941 (1) (321 SE2d 435) (1984) (custody hearing not recorded); *K. E. S. v. State of Ga.*, 134 Ga. App. 843, 850 (4) (216 SE2d 670) (1975) (probation revocation hearing not recorded).

The proceedings in this case occurred over four separate sessions. A complete, certified record exists for three of the four hearing dates, and a partial transcript exists for the remaining November 29 hearing. During that proceeding, the juvenile court denied the motions for further psychological examinations, issued an oral ruling that terminated the mother's parental rights, and heard from counsel regarding the future placement of the children. No evidence was presented at this hearing, and the trial court's oral ruling on termination was followed by a detailed 13-page written order. Moreover, the problem with the recording apparently was not discovered until the court reporter attempted to transcribe the record for appeal.

Therefore, a transcription was made of all evidence presented to the juvenile court. The reasoning behind the rulings at issue on appeal was either transcribed or included in a written order. Accordingly, nothing hindered this Court's review of the pertinent portions of the proceedings, and the grandmother has not demonstrated how limited omissions from the attorney's discussions with the juvenile court prevented her from fully presenting her appeal. We conclude, therefore, that under the circumstances of this case, the purposes of OCGA § 15-11-28 (b) were satisfied, and no reversible error occurred.

3. The grandmother next contends that the trial court erred in denying her custody of the children. The grandmother argues that she had custody prior to DFACS' intervention. She points to a written agreement signed by the parents in 1989 granting her custody of S. K. While this document reflects a private arrangement between the parents and the grandmother with regard to S. K., this document does not purport to apply to F. K. Moreover, there is no evidence that a court ever granted the grandmother legal custody of either child. Accordingly, this document was not binding upon the trial court.

Rather, the trial court was required to comply only with the strictures of OCGA § 15-11-90.[6]

And as this Court has held, nothing in OCGA § 15-11-90 (a) requires a trial court to place the children with a family member:

> OCGA § 15-11-90 (a) does not require a trial court to give a preference to family members in making a placement of a child following termination of parental rights. Rather, the statute states that "(a) placement shall be made under the terms of this paragraph only if such a placement is in the best interest of the child."

*In the Interest of B. R. W.*, 242 Ga. App. at 240 (3).

Here the juvenile court heard evidence that, despite her desire to do so, the grandmother was not suited to be an adequate parent to S. K. and F. K. or to protect them from future harm. In fact, the evidence showed that the grandmother's continued denial that the children had ever been abused would cause further harm. And Dr. Kennedy testified that counseling or therapy would not alter the grandmother's basic character deficiency. Moreover, the juvenile court heard evidence that an evaluation had been conducted on the grandmother's home and it was determined not to be appropriate for the children's placement. Under these circumstances, we find no abuse of discretion in the trial court's determination that it was not in the children's best interests to place them with the grandmother. See *In the Interest of B. R. W.*, 242 Ga. App. at 241.

4. The grandmother also contests the juvenile court's denial of her motion for further psychological evaluations. For the reasons set forth in Division 1 above, we find no error in the denial of the grandmother's motion for further evaluation of the children. And similarly, we find no error in the juvenile court's denial of the grandmother's request for further psychological evaluation of the mother and herself. The trial court heard testimony from Dr. Kennedy with regard to his evaluation of the two women. Although that evaluation had taken place a few years earlier, Dr. Kennedy testified that the condition of the two women was "characterological," not conducive to therapy or counseling, and not likely to change. Accordingly, we cannot say that the juvenile court abused its discretion in denying further evaluations.

*Judgments affirmed. Miller and Mikell, JJ., concur.*

---

[6] Now OCGA § 15-11-103.

DECIDED FEBRUARY 19, 2001.

*Smith, Hannan & Parker, James R. Smith, Jr., Don T. Lyles*, for appellants.

*Thurbert E. Baker, Attorney General, Dennis R. Dunn, Deputy Attorney General, William C. Joy, Senior Assistant Attorney General, Shalen S. Nelson, Assistant Attorney General, Daniel M. Mitchell, Jr.*, for appellee.