622 S.E.2d 860 (2005)
276 Ga. App. 197
In the Interest of L.W. et al., children.
In the Interest of D.M., a child.
In the Interest of L.W., a child.
Nos. A05A1899-A05A1901.
Court of Appeals of Georgia.
November 2, 2005.
*862 Terry & Peterman, Jody D. Peterman, Valdosta, Wendell R. Adams, Dublin, for appellants.
Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Charissa A. Ruel, Assistant Attorney General, Charles C. Butler, Dublin, for appellee.
ADAMS, Judge.
In Case No. A05A1899, the biological mother of L.W. and D.M. appeals the orders terminating her parental rights. The mother contends that the record fails to support two findings of fact made by the juvenile court. In Case Nos. A05A1900 and A05A1901, the maternal grandmother challenges the juvenile court's decision not to place D.M. and L.W. in her care.

Case No. A05A1899
In termination of parental rights cases, we consider the evidence in the light most favorable to the juvenile court's order. See In the Interest of D.W., 235 Ga.App. 281, 509 S.E.2d 345 (1998). In conducting our review, we do not weigh the evidence or resolve credibility disputes but defer to the juvenile court's factual findings. See In the Interest of D.F., 255 Ga.App. 153, 564 S.E.2d 767 (2002).
Viewed in this manner, the record shows that the Laurens County Department of Family and Children Services (DFACS) became involved in the lives of L.W. and D.M. in May 2003, after receiving a report that their mother was neglecting them and abusing drugs. In June 2003, the mother was arrested in Florida on charges of the theft of a handgun and OxyContin, a controlled substance, and she was transported back to Georgia. In July 2003, the mother failed to attend a drug assessment and a home visit revealed the unsanitary condition of her home and that L.W. "had numerous bug bites on her legs." On July 25, 2003, DFACS took L.W., then age one, and D.M., age two, into custody.
After the mother tested positive for cocaine on a drug screen, the juvenile court appointed a Court Appointed Special Advocate (CASA) as guardian ad litem for the children on July 28, 2003. DFACS filed deprivation petition, and, after a hearing on August 20, 2003, the juvenile court entered orders finding the children deprived and directing the mother to complete a drug treatment program.
In recounting her personal history, the mother told caseworkers that she lived with *863 her mother in California until age five before being sent back to Georgia to live with her alcoholic father. The mother reported that she began using drugs at age 12, and by age 15 was on extensive probation for drug use, disorderly conduct, running away, skipping school, and shoplifting. She admitted continuing to use drugs and stealing the handgun and the OxyContin in June 2003. She also disclosed that she did not get along with her mother and was "very adamant" that the children not be placed with her mother.
In addition to completing drug treatment, the mother was required to remain drug and alcohol free for six consecutive months and to test negative on drug screens but failed to do so. In August 2004, as a result of the mother's failure to complete drug treatment, her failure to demonstrate the ability to care for L.W. and D.M., and her failure to comply with other requirements of her case plan, DFACS filed separate petitions to terminate her parental rights as to each child.
Evidence at the termination hearing indicated that after the mother's outpatient drug treatment failed, she entered inpatient treatment programs five times between January and June 2004. Each time, she left the program before its completion. On February 19, 2004, the mother was terminated from a program for possessing illegal pills. On March 29, 2004, the mother relapsed and left treatment after only one day. In June 2004, the mother tested positive for cocaine and benzodiazepine and admitted having smoked crack cocaine while in treatment. Upon entering a methadone clinic in Florida in June 2004, the mother again tested positive for benzodiazepine, and she did so again on September 8, 2004. Despite claiming to have a valid prescription for benzodiazepine, she failed to produce any supporting documentation to that effect. Even though required to submit to random drug screens, she had refused to participate in a drug screen on March 1, 2004. Despite a requirement not to live with anyone using alcohol or drugs, she resided with her boyfriend who tested positive for drugs on August 5, 2003.
Kay Braddy, the DFACS case manager, testified that the mother also did not achieve the goals of obtaining stable employment and housing. She was still jobless and had moved three times before relocating to Florida. During a home visit, Braddy noticed a "roach clip" in an ashtray indicating marijuana usage in the home. Nor did the mother complete parenting classes as required. In all, the mother visited her children only 17 times during the 16 months of foster care. During a scheduled visit in May 2004, the mother was pregnant and admitted she was continuing to use drugs. Also, the mother had not paid child support, provided documentation as to housing, or resolved her pending criminal charges.
Melissa Martin, a Community Mental Health Center counselor, testified that the mother had not made any progress in drug treatment. Martin expressed concern about her addictions to cocaine, alcohol, and marijuana and the fact that methadone treatment did not address those dependencies or the need for additional addiction treatment. Martin indicated that the mother's continued abuse of benzodiazepine was not being treated.
The mother conceded that she had no job and relied upon her boyfriend to pay the rent for the one-bedroom apartment where she was living with him and her new baby. She denied that her boyfriend had ever had a drug problem while admitting that he had graduated from the Laurens County Drug Court. She was unable to explain why she had not completed parenting classes and confirmed having used drugs since she was 13 and while pregnant with her youngest child.
When the termination hearing resumed on January 21, 2005, the mother testified that since the last hearing on November 10, 2004, she had moved to another one-bedroom apartment. She conceded that her current methadone treatment program was not designed to deal with her addictions to cocaine, marijuana, and alcohol. She also admitted that she and her boyfriend had both used drugs in 2004 in violation of her case plan. She acknowledged that she still did not have a job and that her criminal charges had not been resolved.
A report submitted by CASA in January 2005 recommended terminating the mother's *864 parental rights and suggested placing the children permanently with the foster parents who wanted to adopt them and with whom the children had bonded. On January 25, 2005, the guardian ad litem filed separate written reports as to L.W. and D.M. in which he recommended the termination of the mother's parental rights. While noting that the mother was "no longer in the deepest depths of addiction and destructive behavior," the guardian expressed his belief that she had not taken adequate steps to deal with her drug addiction. He also noted that she had not been able to maintain a meaningful relationship with her children or to maintain suitable housing.
The juvenile court entered separate orders terminating the mother's parental rights to each child. The mother appeals.
1. The mother asserts that the juvenile court erred in terminating her parental rights because the State failed to meet its burden of establishing by clear and convincing evidence that the children's deprivation was likely to continue or not be remedied. She claims that she "made significant progress in turning her life around," and remains drug free in a rehabilitation program and is "living in a safe and stable home with a new baby and her partner."
In deciding whether to terminate parental rights, a juvenile court must apply this two-step analysis as mandated by statute:
First, there must be a finding of parental misconduct or inability, which requires clear and convincing evidence that: (1) the child is deprived; (2) the lack of proper parental care or control is the cause of the deprivation; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. If these four factors exist, then the court must determine whether termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home.
(Footnotes omitted.) In the Interest of V.M.T., 243 Ga.App. 732, 735-736(3), 534 S.E.2d 452 (2000). See OCGA § 15-11-94(b)(4)(A).
The mother challenges the evidence as to the third factor in step one. She argues that she has made progress "in turning her life around."
Evidence of past conduct may properly be considered in determining whether the deprivation would likely continue. See In the Interest of J.O.L., 235 Ga.App. 856, 858, 510 S.E.2d 613 (1998). A parent's conduct over an extended period of time is generally a better predictor of future conduct than a few months of partial stability or some temporary progress. See In the Interest of L.S.D., 243 Ga.App. 626, 628, 534 S.E.2d 109 (2000). The children were adjudicated deprived primarily due to their mother's drug problems and her neglect of them. The record reflects that the mother's longstanding problems with drug addiction have not as yet been resolved. She remains a high school dropout, who is financially dependent upon her current boyfriend, and she lacks employment. Given the mother's apparent inability to successfully complete a drug treatment program and her failure to fulfill the other provisions in her case plan, a rational trier of fact could find that such misconduct or inability is likely to continue and unlikely to be remedied. See In the Interest of D.N.M., 235 Ga.App. 712, 713, 510 S.E.2d 366 (1998).
2. The mother contends that the juvenile court erred in terminating her parental rights because the State failed to meet its first prong burden of establishing by clear and convincing evidence that the children's continued deprivation was likely to cause serious physical, mental, emotional, or moral harm to them. We cannot agree. These children have been in state custody since July 2003. Despite the passage of nearly 18 months, the mother made little progress on her case plan, including obtaining a driver's license and employment. At the time of the January hearing, she had not yet completed her treatment in a methadone clinic. Past conduct including past misconduct may be considered in determining whether situations are likely to continue and unlikely to be remedied. See In the Interest of J.O.L., 235 Ga.App. at 858, 510 S.E.2d 613. The mother *865 has a demonstrated history of irresponsible and neglectful conduct toward her children and an established pattern of joblessness and instability. Her ongoing drug abuse and multiple drug addictions and her failure to complete the essential elements of her case plan would negatively impact the children's well-being. From this evidence, a rational trier of fact could find sufficient clear and convincing evidence that the unresolved patterns of misbehavior would be likely to cause severe emotional harm to the children. See In the Interest of M.J.T., 255 Ga.App. 553, 556, 565 S.E.2d 877 (2002).

Case Nos. A05A1900 and A05A1901
3. In her first two enumerations of error in Case Nos. A05A1900 and A05A1901, the grandmother asserts that the juvenile court erred in terminating the parental rights of her daughter to L.W. and D.M. These assertions are not properly raised because "[o]nly a party who is aggrieved by a judgment has the right to appeal that judgment." (Citation omitted.) In the Interest of B.R.W., 242 Ga.App. 232, 239(3), 530 S.E.2d 5 (2000). A party is "aggrieved" by a judgment if the judgment "operates on his rights of property, or bears directly upon his interest." (Citation and punctuation omitted.) Southwire Co. v. Hull, 212 Ga.App. 131, 132, 441 S.E.2d 293 (1994). Since the grandmother is not an "aggrieved" person within the meaning of our law with respect to her daughter's parental rights to L.W. and D.M., she is foreclosed from enumerating these issues as error.
4. Next, the grandmother contends that she "was denied due process of law and a fair trial as guaranteed by the 6th and 14th Amendments [under the federal and state constitutions] when the Court refused to rule on her Petition for Placement with Relatives, refused to allow her to participate in the Termination Hearing, and then ruled on her fitness in the Termination Order."
The record belies her claims. As discussed in more detail below, the juvenile court considered placing the children with her and conducted an evidentiary hearing on that issue. Moreover, the law does not mandate the placement of a child with a relative. Instead, OCGA § 15-11-103(a)(1) requires that:
If, upon the entering of an order terminating the parental rights of a parent, there is no parent having parental rights, the court shall first attempt to place the child with a person related to the child by blood or marriage or with a member of the child's extended family if such a person is willing and, after study by the probation officer or other person or agency designated by the court, is found by the court to be qualified to receive and care for the child, if the court determines such placement is the most appropriate for and in the best interest of the child.
Absent an abuse of discretion, we will not disturb a juvenile court's determination that placement with a relative is not in the best interest of the child. See In the Interest of A.L.S.S., 264 Ga.App. 318, 324, 590 S.E.2d 763 (2003). Even assuming that the grandmother has the right to contest the trial court's refusal to award her custody of her two grandchildren, the juvenile court did not abuse its discretion in declining to award custody to her following the termination of her daughter's parental rights. See In the Interest of B.R.W., 242 Ga.App. at 240, 530 S.E.2d 5.
Here, the record shows that the parental rights of both parents were terminated and the maternal grandmother was the only relative who sought custody of the children. On February 11, 2004, the grandmother filed separate documents to "Petition for Placement with Relatives and for Custody" as to L.W. and D.M. Recognizing her petitions as motions to transfer custody to her, in April 2004, the court ordered the grandmother, who resided in Florida, to cooperate with the guardian ad litem program in her judicial circuit and to make her home in Florida available for an evaluation. The court also directed CASA to submit an itemization of questions and issues to be resolved by that evaluation.
In September 2004, approximately six months later, the juvenile court held an evidentiary hearing on the grandmother's qualifications. At the outset of the proceeding, *866 the State moved to dismiss the grandmother's motion to change custody from DFACS to her because the grandmother had not filed a written motion to intervene in the termination proceeding. The juvenile court rejected the State's argument that the grandmother lacked standing to file the motion and proceeded to hear the motion on its merits.
At the September 2004 evidentiary hearing, four witnesses including the grandmother testified. Among other things, the court decided to consider evidence about the grandmother's parenting of her own children as it "relates to whether she would be a good parent to her own grandchildren." According to the grandmother, in July 2003, when she heard that L.W. and D.M. were in DFACS custody in Georgia, she was living in California where she owned rental property in addition to that owned in Georgia and Florida. She explained that in December 2003, she had moved to Florida where she had rental property. She testified that her daughter was currently living nearby in the same neighborhood in Florida. She admitted, however, that although she knew the children were in DFACS custody in late July 2003, she did not inquire about the children or try to obtain custody of them until October 2003. When asked about her daughter's parenting, she testified that she considered her daughter "a very good mother actually." The grandmother also testified that as far as she knew, her daughter did not have an alcohol or drug problem. She admitted that after her daughter's release from jail that she had returned the children to her daughter and had not been concerned for the children's safety. She felt that her daughter's arrest in June 2003 on drug charges was not justified and thought that other people were trying to get her daughter in trouble. The grandmother believed that the reasons for removing the children were exaggerated and that the children were not neglected. In addition, the grandmother admitted having only visited her grandchildren twice between March and September 2004, despite knowing that she could visit them more frequently.
Kay Braddy, the DFACS case manager, testified that the grandmother had not expressed any desire for visitation and had seen L.W. and D.M. only three times after their placement in foster care. Braddy voiced concern about the grandmother's lack of contact with the children, her minimization of the mother's drug problems, her poor parenting skills, and her knowingly returning the children to their mother despite the pending criminal charges. Braddy also expressed concern about the grandmother's refusal to reveal her daughter's location after the mother moved to Florida. In her view, it was in the children's best interests at that time to remain with their foster parents.
Cathy S. Chism, the CASA volunteer on the case, also testified at the hearing. Prior to the proceeding, CASA filed a report in the court. The CASA report noted that the grandmother did not visit the children until January 15, 2004, six months after "they were taken away from their mother because of deprivation  including the mother's drug usage and failure to provide adequate food, clothing, shelter and supervision." The report noted that the grandmother had "the children from June 18, 2003 until July 1, 2003 in Florida due to the fact that [the mother] had been arrested." The CASA report further noted that about three weeks after the mother's release from prison, DFACS had to take custody of the children on July 25, 2003, due to the mother's "continual drug usage and her not providing a safe environment and stable housing for the children." The report also noted the significance of the mother's failure to complete a drug treatment plan "considering her present pregnancy." The report recommended that the children remain in foster care at that time. Although Florida officials conducted an evaluation of the grandmother's home and ascertained that the home was in good condition and that the grandmother had sufficient income, the report made no recommendation as to placement of the children with the grandmother.
At the evidentiary hearing, Chism expressed concern about the grandmother's six-month delay in visiting the children after the State took them into custody; that the grandmother visited them only for five hours in more than 365 days; that she moved three places in six months including to California *867 and Florida; and that while the children had been in foster care, she did not phone the children frequently or otherwise contact them. Chism advised the court that she had not changed her opinion from the CASA report previously submitted to the court.
The children's foster mother testified that during the year in which the children lived in her home, she had only met the grandmother twice and that phone contact had been sporadic. She testified that after she had arranged for the grandmother to call her home twice a month to speak with the children, she had not done so. She also testified that the grandmother had cancelled at least two scheduled visits and had not sent any birthday gifts or Christmas presents to the children. The foster mother expressed her desire to adopt the children into her family.
At the conclusion of the hearing, the juvenile court stated that it was going to take the matter under advisement. Apparently, the court delayed ruling on the grandmother's suitability as a placement until it issued separate orders that terminated the mother's parental rights to L.W. and D.M. In identical orders, the court concluded that:
after an exhaustive and thorough search for a suitable family member, and a hearing thereon, for placement of the child[ren] by the Court and the Department of Human Resources that it is not in the best interest of the child[ren] to effect a relative placement under OCGA § 15-11-90(a)(1). Only one relative, [the maternal grandmother,] has expressed interest in the child[ren] and she was found to be an unsuitable placement for the child[ren].
OCGA § 15-11-103(a)(1) does not dictate that a court automatically place a child with a relative whenever a relative expresses willingness to raise the child. While the law clearly requires an attempt at such placement be made, it also requires the court to find that the relative or member of the extended family is "qualified to receive and care for the child" and to find that the placement with the relative "is the most appropriate for and in the best interest of the child." OCGA § 15-11-103(a)(1).
Here, the juvenile court obviously considered the suitability of placing the children with their grandmother, a person willing to raise them. In determining the grandmother's qualifications to care for L.W. and D.M., the juvenile court was entitled to consider the grandmother's own past record as a parent and her demonstrated parenting skills or the lack thereof. The grandmother's perception of her daughter as "a very good mother" and her avowed denial of her daughter's obvious and serious drug problems would seem problematic. CASA, the agency designated by the court to study the placement issue, did not find the grandmother to be qualified as a suitable placement. In addition, the record contains evidence that the children were thriving in their foster care home and that their foster parents wished to adopt them. Thus, the record supports the juvenile court's decision that placement with their grandmother was not in the best interests of the children. See In the Interest of C.L.R., 232 Ga.App. 134, 139(3), 501 S.E.2d 296 (1998).
Judgments affirmed in Case Nos. A05A1899, A05A1900 and A05A1901.
SMITH, P.J., and ELLINGTON, J., concur.