A01A1592. IN THE INTEREST OF A. B. et al., children.
(555 SE2d 159)

RUFFIN, Judge.

The Carroll County Juvenile Court terminated the parental rights of the natural mother of A. B. and D. B. In two enumerations of error on appeal, the mother challenges the court's ruling. Because we find no error, we affirm.

In reviewing a juvenile court's termination of parental rights, we view the evidence in the light most favorable to that court's decision, and we will affirm if the evidence demonstrates that any rational trier of fact could have found by clear and convincing evidence that the parent's right to custody has been lost.[1] So viewed, the record shows that the mother gave birth to a daughter, A. B., on April 30, 1996, and a son, D. B., on July 31, 1998. Prior to D. B.'s birth, Tracie Lewis, who works with a parenting program in Carrollton, met the mother when she brought A. B. to day care at the program. Lewis testified that A. B., who was almost two at the time, "always had a strong odor about herself and she was not very clean."

In March 1998, the Department of Family & Children Services (DFCS) opened a case file on the mother. In October 1998, Lewis received a referral from DFCS to aid the mother in developing parenting skills, in obtaining her GED, in securing housing, and in tapping into community resources. Lewis testified that she often visited the trailer where the mother lived with her children. According to Lewis, "[s]ometimes I would find [the] children there and [the mother] would not be there." Lewis expressed concern for the health and hygiene of the children. She often would find A. B. inadequately dressed and dirty. She also attended D. B.'s doctor appointments and

---

[1] See *In the Interest of J. M. M.*, 244 Ga. App. 171 (534 SE2d 892) (2000).

was concerned because he was not gaining weight, "[h]e was not reaching his developmental milestones," and "[h]is large and small motor skills were way below average." Lewis testified that both children ate inappropriate food and drank soured milk.

Lewis discussed the importance of good nutrition and hygiene with the mother. During a visit to the home, Lewis discovered that A. B. was sleeping on a mattress on the floor that was soiled with urine and feces. D. B. slept in a bassinet on the floor that was infested with roaches. According to Lewis, the entire trailer was infested with roaches, including roaches in the refrigerator. Lewis testified, "I was so taken aback by what I had found [at the trailer] that I went straight to DFCS and got the [supervisor] to go out and view the home." The mother was told to clean the trailer, but subsequent visits showed no improvement. DFCS gave the mother from August 27, 1999, to September 7, 1999, to clean her home, but she failed to do so.

DFCS sought to remove the children from the mother's care, and the juvenile court entered a detention order on September 9, 1999. Following a deprivation hearing, the juvenile court concluded that the children were deprived and granted temporary custody to DFCS. DFCS developed a reunification plan, which required the mother to "maintain her home free from health and safety hazards" and to "maintain her bond with" her children. The plan contained detailed steps to assist the mother in maintaining a sanitary home and provided for visits with the children.

Margaret Raiden, the mother's caseworker, discussed the plan with the mother and her attorney. But in October 1999, before Raiden could begin providing parent aid services, the mother moved out of her trailer and in with her grandparents. The mother told Raiden that the move was temporary, and Raiden asked the mother to contact her when the mother was settled so that DFCS could begin in-home services. In January 2000, the mother contacted Raiden to say that she had moved to Atlanta, but was unable to provide an address.

Also in January 2000, Lorie Bell took over as the mother's caseworker. In February 2000, Bell located the mother in Norcross. By May 2, the mother was back in Carrollton, where she was living in a trailer with two friends. On this date, Bell spoke with the mother about the case plan and gave her several leads for possible apartments. According to Bell, whenever she spoke with the mother, she emphasized the importance of meeting the case plan goals, which Bell described as "very simply housing and employment."

In June 2000, the mother moved back to Atlanta. In July, the mother moved to Chamblee, and in October, she moved to a trailer on

Bankhead Highway, which Bell believed was the residence of the mother's parents. As a result of the mother's constant movement, DFCS was unable to begin in-home counseling as required by the case plan.

DFCS filed a petition for termination of the mother's parental rights, and a hearing was held on February 22, 2001. During the hearing, Raiden and Bell testified regarding the mother's many moves. Bell testified that, although the mother initially visited with the children weekly, she began missing scheduled visits. The testimony also demonstrated the mother's failure to find employment. The mother testified that she had obtained a job a month before the termination hearing, which she still held. However, the mother admitted that she had worked for only three days during the previous year.

Based on the evidence presented, the juvenile court entered an order terminating the mother's parental rights.

1. In the mother's first enumeration of error, she contends that the juvenile court erred in allowing DFCS "an unreasoned expansion of the evidence beyond that contemplated by" OCGA §§ 15-11-1 and 15-11-81. The mother points to the deprivation petition, filed in February 1999, which alleged that the mother was not cooperating with DFCS. The mother complains that the juvenile court permitted DFCS to question Lewis about events that occurred before DFCS actually became involved with the mother. Thus, the mother appears to assert that the juvenile court relied upon inadmissible evidence in concluding that the children were deprived.

We note, however, that the juvenile court ruled the children were deprived in an order dated October 6, 1999, which the mother never appealed. "[I]t is well established that, when no appeals are taken from juvenile court orders finding that a child was deprived, an appellant is bound by that finding and any challenges to those orders are not preserved for appeal."[2] It follows that the mother cannot, at this late date, challenge the evidence relied upon by the juvenile court to support its finding of deprivation.

2. In her second enumeration of error, the mother contends that the juvenile court erred in terminating her parental rights, asserting that such termination was not supported by clear and convincing evidence. We disagree.

In a termination of parental rights proceeding, the juvenile court employs a two-step process.[3] First, the juvenile court must determine

---

[2] *In the Interest of C. M.*, 236 Ga. App. 874, 876-877 (1) (513 SE2d 773) (1999).
[3] See *In the Interest of K. L.*, 234 Ga. App. 719, 722 (507 SE2d 542) (1998).

whether there is clear and convincing evidence of parental miscon-
duct or inability, which shall be proved by demonstrating

> that (1) the child is deprived; (2) such deprivation is caused
> by the lack of proper parental care or control by the parent
> in question; (3) the deprivation is likely to continue; and (4)
> the continued deprivation will cause or is likely to cause
> serious physical, mental, emotional, or moral harm to the
> child. Once the trial court establishes a lack of parental care
> and control, the second part of the test for determining
> whether parental rights should be terminated is whether
> such termination is in the best interest of the child, after
> considering the physical, mental, emotional, and moral con-
> dition and needs of the child who is the subject of the pro-
> ceeding, including the need for a secure and stable home.[4]

The unappealed deprivation order discussed above establishes
that the children are deprived.[5] Since the mother had been without
custody of her children for over a year, the juvenile "court was autho-
rized under [OCGA § 15-11-94 (b) (4) (C)] to determine that the
[mother], without justifiable cause, failed to comply with the plan for
reunification," thus showing her lack of proper parental care and con-
trol.[6] Here, the record amply supports the juvenile court's conclusion
that the mother failed to comply with the plan.

The main reason DFCS removed the children from the mother's
custody was the mother's inability or unwillingness to maintain a
sanitary home. The primary goal of the reunification plan was for the
mother to learn "how to maintain a clean home." Accordingly, it was
central to the plan's success that the mother actually have a home,
which she would then be required to clean. The mother's many moves
and her failure to timely notify DFCS of address changes prevented
the caseworkers from monitoring the mother's cleanliness and com-
pletely eviscerated the purpose of the reunification plan.

Moreover, the evidence shows that the deprivation is likely to
continue. "A court can consider the past conduct of a parent when
determining whether conditions of deprivation are likely to continue.
The decision as to a child's future must rest on more than positive
promises which are contrary to negative past fact."[7] Prior to taking
A. B. and D. B. into custody, DFCS provided services to the mother to

---

[4] (Punctuation omitted.) *In the Interest of D. P.*, 244 Ga. App. 553, 554 (536 SE2d 225)
(2000).

[5] See *In the Interest of K. L.*, supra.

[6] Id.

[7] (Citation and punctuation omitted.) *In the Interest of D. L. T.*, 238 Ga. App. 491, 496
(519 SE2d 257) (1999).

assist her in developing parenting skills. Lewis testified that she spoke with the mother regarding the importance of cleaning both her home and her children, but the mother evidently disregarded Lewis' advice. Even after Lewis found the children living in filth and squalor, the mother was given an opportunity to rectify the situation, but failed to do so. Once the children were taken into custody, the mother had over a year to demonstrate her ability to maintain a sanitary home. Again, she failed to do so. Under these circumstances, the juvenile court was authorized to find that the deprivation would likely continue.[8] And, in view of the extreme filth in which the children were living, the juvenile court was also authorized to conclude that such continued deprivation would harm the children.[9] The foul fecal environment of this family was not fit for children.

Finally, the juvenile court was authorized to conclude that termination of parental rights was in the children's best interests. "In looking at this second prong, the court may consider the children's need for a stable home environment and the detrimental effects of prolonged foster care."[10] The juvenile court may also consider the same factors that supported its finding of parental inability.[11] Here, the children's need for a stable, sanitary home coupled with the mother's failure to demonstrate her ability to maintain such home constitutes sufficient clear and convincing evidence that termination was in the best interests of the children.[12]

*Judgment affirmed. Johnson, P. J., and Ellington, J., concur.*

DECIDED OCTOBER 10, 2001.

*James J. Anagnostakis*, for appellant.
*Thurbert E. Baker, Attorney General, William C. Joy, Senior Assistant Attorney General, Shalen S. Nelson, Laura W. Hyman, Assistant Attorneys General, T. Michael Flinn*, for appellee.

---

[8] See *In the Interest of K. L.*, supra.
[9] See id.
[10] *In the Interest of C. T.*, 247 Ga. App. 522, 524 (1) (544 SE2d 203) (2001).
[11] See id.
[12] See id. at 525.