564 S.E.2d 767 (2002)
255 Ga. App. 153
In the Interest of D.F. et al., children.
No. A02A0156.
Court of Appeals of Georgia.
April 24, 2002.
*768 Carol B. Miller, for appellant.
Thurbert E. Baker, Atty. Gen., Dennis R. Dunn, Deputy Atty. Gen., William C. Joy, Senior Asst. Atty. Gen., Shalen S. Nelson, Asst. Atty. Gen., Gary A. Sinrich, Hinesville, for appellee.
BARNES, Judge.
Following a hearing, the Bryan County Juvenile Court terminated the parental rights of the mother of D.F., a four-year-old boy, and D.F., a six-year-old girl. The mother appeals, arguing that insufficient evidence supports the termination. We disagree and affirm.
In reviewing a parent's challenge to the sufficiency of the evidence, we determine whether, after reviewing the evidence in the light most favorable to the State, a rational trier of fact could have found by clear and convincing evidence that a natural parent's right to custody has been lost. In the Interest of A.C., 230 Ga.App. 395, 396(1), 496 S.E.2d 752 (1998). We do not weigh the evidence or determine witness credibility, but defer to the juvenile court's factfinding. In the Interest of L.H., 236 Ga.App. 132, 133(1), 511 S.E.2d 253 (1999).
Viewed in this light, the evidence shows that the two children came into DFCS custody in March 1997. D.F., the boy, was three weeks old and began having seizures after his mother picked him up from the babysitter. She took him to the hospital, where due to symptoms of retinal hemorrhages and evidence of brain injury the physicians diagnosed shaken baby syndrome. DFCS took temporary custody of D.F. when the hospital discharged him and also of his sister, D.F., due to concerns she may be exposed to the same sitter.
The department worked with the mother to develop and meet the reunification goals of getting and maintaining a stable residence and job, becoming drug-free, and visiting the children regularly. All the social workers who testified at the hearing to determine whether reunification was appropriate and the termination hearing agreed that the mother visited the children regularly. Further, she obtained drug and alcohol counseling and testified that in July 2000 she had been drug-free for two years and alcohol-free for eleven months. She had one positive drug screen in November 1997 and nine subsequent negative screens. The maternal grandmother testified in July 2000, however, that she had seen the mother high within the last year, and her case supervisor testified that on several occasions the mother told her not to bother with a drug screen because it would be positive.
The mother did not establish and maintain a stable residence or job. From March 1997 to July 2000, she lived in fifteen different places with seven different men and worked at seventeen different jobs. She had a pattern of depending on men to help pay her bills, but all of the men she chose to live with had criminal histories or were now in jail. In June 1999, after working with the mother for two years while the two children remained in foster care, DFCS changed its case plan from reunification to adoption.
In July 2000, at a hearing to determine whether reunification was still an appropriate goal, the mother testified that she had lived in the same place with the same man for about 18 months. Her boyfriend at that time testified that the two had lived together for sixteen months, that he was a cabdriver earning sufficient money to care for the mother and the two children, and that he was willing to move into a bigger place to accommodate them. He anticipated the two would stay together a long time.
After that hearing, the juvenile court judge directed DFCS to give the mother an additional 90 days, during which time the department should evaluate her home and report back. On July 10, 2000, Chatham County *769 DFCS received the request for evaluation, and the caseworker sent the mother a letter on July 20, 2000, asking her and her boyfriend to come to the office on August 2. Neither came to the office that day, but the caseworker spoke with the boyfriend and rescheduled a visit for August 28. Neither showed up again, and the caseworker made several unscheduled home visits to try to catch up with them, to no avail. The couple came to the office in early October, but the caseworker was out sick. The caseworker then made a scheduled home visit on October 10; no one was home, and when she returned on October 12, they had moved.
The caseworker and mother finally met face to face on October 18, at which time the mother was living with another man in another residence. The caseworker advised the mother to attend further drug counseling at one of two locations that work with clients on a sliding fee scale, and the mother said she would enroll. At that time, the mother had left her previous boyfriend, who had appeared with her at the permanency hearing, after he was arrested for forging prescriptions, and she had been living with her current boyfriend for two months. When the caseworker subsequently went to meet them at their new apartment, the resident manager said they had been evicted. The caseworker made another appointment and finally evaluated their home, but did not approve it because of concerns the mother had not established any kind of stability while in Chatham County. Between July and October 2000, the mother had worked at five places, had lived with two men, had no income, had debts including probation fines and child support, and was dependent on her current boyfriend to pay her bills. When the caseworker returned three weeks later to request random drug screens, she discovered that the new boyfriend had been fired from his job and the couple had moved again.
In February 2001, the juvenile court entered an order finding that the mother had made little improvement since the July 2000 permanency hearing and had failed to meet the goals required of her. The court concluded that reunification with the mother was no longer appropriate and continued temporary custody in DFCS. At the July 2001 termination hearing, the parties stipulated that the transcript of the permanency hearing would be included for consideration. The Bryan County DFCS caseworker testified that the mother had continued to visit the children regularly and that both children were very confused about their relationship with their mother. D.F., the male child who was diagnosed with shaken baby syndrome, was a special needs child with ongoing physical and speech therapy and eye problems that had required two surgical procedures so far. The juvenile court terminated the mother's parental rights in an order filed June 25, 2001.
Determining whether parental rights should be terminated involves a two-step analysis. In the first step, the court must find parental misconduct or inability, supported by clear and convincing evidence that: (a) the child is deprived; (b) lack of proper parental care or control caused the deprivation; (c) the cause of the deprivation is likely to continue; and (d) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. OCGA § 15-11-94(b)(4)(A)(i)-(iv); In the Interest of L.H., supra, 236 Ga.App. at 132-133(1), 511 S.E.2d 253. Further, "[e]vidence of past unfitness, standing alone, is insufficient to terminate the rights of a parent in her natural child; clear and convincing evidence of present unfitness is required." (Citations and punctuation omitted; emphasis in original.) In the Interest of R.A., 226 Ga.App. 18, 20, 486 S.E.2d 363 (1997); see also In the Interest of D.C.N.K., 232 Ga.App. 85, 90, 501 S.E.2d 268 (1998).
If these four factors exist, then the court must take the second step and determine whether terminating parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home. OCGA § 15-11-94(a).
The mother argues on appeal that clear and convincing evidence did not support the trial court's finding that the children's deprivation was likely to continue or would likely not be remedied, as required by OCGA § 15-11-94(b)(4)(A)(iii). She contends that, "considering *770 all the circumstances, [she] had brought a degree of stability to her life which had not been present since the removal of the children in 1997." She argues that she had been employed at the same location for more than six months, had established a stable home with her current boyfriend, and had been drug-free for two years.
We must review the evidence in the light most favorable to the State to determine whether a rational trier of fact could have found by clear and convincing evidence that the natural parent's right to custody has been lost. In the Interest of A.C., supra, 230 Ga.App. at 396, 496 S.E.2d 752. In this case, ample clear and convincing evidence of the four factors established parental misconduct or inability. First, the unappealed deprivation orders of the juvenile court are sufficient to establish that the children were deprived within the meaning of OCGA § 15-11-94(b)(4)(A)(i). In the Interest of B.P., 207 Ga.App. 242, 244, 427 S.E.2d 593 (1993).
Second, the juvenile court was authorized to determine that the mother's failure to comply with the reunification plan established her lack of proper parental care and control. In the Interest of A.B., 251 Ga.App. 827, 830(2), 555 S.E.2d 159 (2001). Here, the record amply supports the juvenile court's conclusion that the mother failed to comply with the plan.
Third, in determining whether the children's deprivation is likely to continue, the juvenile court could consider the parent's past conduct. In the Interest of K.L., 234 Ga.App. 719, 722, 507 S.E.2d 542 (1998). As discussed earlier, the juvenile court was impressed at the permanency hearing with the mother's progress toward her goals and, before ruling on whether to change the plan from reunification to adoption, directed DFCS to evaluate the mother's current home. Between that time, July 2000, and February 2001, the mother had moved in with a new boyfriend and the two had moved five times. This clear and convincing evidence supports the juvenile court judge's conclusion that the children's deprivation was likely to continue.
Fourth, clear and convincing evidence showed that continued deprivation likely would harm the children. Based on the evidence presented, we find that a rational factfinder could have found by clear and convincing evidence that the children's deprivation was likely to continue and have a detrimental effect on them. In the Interest of L.S.F., 217 Ga.App. 478, 481, 458 S.E.2d 370 (1995).
As to the second prong of the termination analysis, the evidence also was sufficient to show that termination of appellant's parental rights was in the best interest of the two children. We have held that "the court may consider the child's need for a stable home environment and the detrimental effects of prolonged foster care. Children need permanence of home and emotional stability or they are likely to suffer serious emotional problems." (Citations omitted.) In the Interest of J.O.L., 235 Ga.App. 856, 858, 510 S.E.2d 613 (1998). Here, the evidence showed that the children had been in foster care for four years and need a stable home, and the foster parents for each child were ready to adopt them. Additionally, the same factors that show the mother's instability support a finding that termination of parental rights would be in the children's best interests. Id.
Accordingly, we affirm the order of the juvenile court terminating appellant's parental rights.
Judgment affirmed.
POPE, P.J., and RUFFIN, J., concur.