578 S.E.2d 920 (2003)
260 Ga. App. 118
In the Interest of N.Q. et al., children.
No. A02A1822.
Court of Appeals of Georgia.
March 10, 2003.
Stephen B. Taylor, Statesboro, for appellant.
Thurbert E. Baker, Atty. Gen., Dennis R. Dunn, Deputy Atty. Gen., William C. Joy, Senior *921 Asst. Atty. Gen., Shalen S. Nelson, Laura W. Hyman, Asst. Attys. Gen., for appellee.
RUFFIN, Presiding Judge.
Following a hearing, the juvenile court terminated the mother's parental rights to her three children, N.Q., J.Q., and I.A.[1] The mother appeals, challenging the sufficiency of the evidence supporting the termination. For reasons that follow, we affirm.
Before terminating parental rights, the juvenile court must conduct a two-step analysis.[2] First, the court "must find clear and convincing evidence that parental misconduct or inability exists under OCGA § 15-11-94(b)."[3] Second, the juvenile court "must determine if termination is in the best interests of the children."[4] In reviewing the juvenile court's ruling, we construe the evidence in the light most favorable to its ruling and determine whether "a rational trier of fact could have found by clear and convincing evidence that a natural parent's right to custody has been lost."[5] On appeal, "[w]e do not weigh the evidence or determine witness credibility, but defer to the juvenile court's factfinding."[6]
Viewed in this light, the evidence shows that, in January 2000, the Bulloch County Department of Family and Children Services ("DFCS") received a report about inappropriate conditions and drug use at the mother's home. On January 14, 2000, DFCS obtained a court order to enter the home and interview the children.
DFCS caseworkers who executed the order discovered that the mother's house had no electricity or gas, and it did not have running water in the kitchen. According to caseworker Diane Hardy, clothes and trash "were piled up all over," the house had little or no food, and the children were "very dirty." Several adults, including the mother, were present in the home. As described by Hardy, these adults were uncooperative and claimed that "they did not have to follow [the] rules or guidelines or laws" of Georgia.
A few days later, DFCS took the three children, who were four, seven, and nine years old, into custody. At that point, Hardy learned that the children had never been to school and could not read. On March 6, 2000, the juvenile court found the children to be deprived.
DFCS developed a reunification plan, which required the mother to visit the children, submit to a psychological evaluation, keep in contact with DFCS, complete a parenting course and substance abuse program, financially support the children, obtain suitable housing, and maintain a legitimate source of income. Caseworker Kirby Waters testified that the mother met the visitation requirement, but she did not submit to the psychological evaluation, take a parenting course, or enroll in a substance abuse program. She also failed to maintain contact with DFCS or keep Waters advised of her living arrangements and employment status.
According to Waters, the mother ignored most of the requirements in the original reunification plan and subsequent case plans developed by DFCS.[7] Rather than working with the agency, the mother told Waters that she would not cooperate because DFCS was engaged in "a lie and a conspiracy." In a pleading submitted to the juvenile court, she further stated that she could not "determine the source of the authority that seeks to take [her] children or to interfere with the rights of indigenous families to live in harmony with natural law and raise their children as they see fit in accordance with the traditions of their ancestors."
*922 Based on the mother's wilful failure to comply with the DFCS case plans, the juvenile court determined on January 10, 2001, that further efforts to reunify the family would be detrimental to the children. Accordingly, it ended the reunification services.
On August 6, 2001, DFCS petitioned to terminate the mother's parental rights. Shortly thereafter, the mother informed DFCS that she was "willing to cooperate to get her children back." At the termination hearing on November 5, 2001, the mother testified that she had been attending a parenting class for several weeks and would complete the course the next day. She also stated that she had lived in the same duplex for approximately six months and currently worked two jobs, although she did not know her monthly income. According to the mother, she would be able to meet all case plan requirements if given an additional three months. She also promised to cooperate with DFCS and keep her children in school if they were returned to her.
The guardian ad litem recommended termination, expressing concern that if the children returned to their mother, she would disappear with them and they "would grow up uneducated and at a terrible disadvantage." The juvenile court agreed with the guardian ad litem's recommendation. Noting the conditions in which the children were originally found and the mother's refusal to cooperate with DFCS for almost two years, the juvenile court terminated her parental rights. We find no error.
1. Under OCGA § 15-11-94(b)(4)(A), parental misconduct or inability exists when: (a) a child is deprived; (b) the parent's lack of proper care or control caused the deprivation; (c) the cause of the deprivation is likely to continue or will not likely be remedied; and (d) continued deprivation will or is likely to cause serious physical, mental, emotional, or moral harm to the child.[8] As discussed below, the record in this case presents clear and convincing evidence of each element.
(a) The mother failed to appeal the juvenile court's March 6, 2000 order finding the children to be deprived. That unappealed order establishes deprivation for purposes of OCGA § 15-11-94(b)(4)(A)(i).[9]
(b) When examining parental care and control of a child in State custody, the juvenile court must consider whether, during the period before DFCS filed the termination petition, the parent significantly failed to comply with a reunification plan for one year.[10] The parent's failure to support the child as required by law also factors into this inquiry.[11]
Other than meeting the visitation requirement, the mother made little effort to comply with the reunification plan. In fact, she specifically told DFCS that she would not cooperate with the agency or take part in the reunification process, and that staunch refusal led the juvenile court to terminate reunification services almost one year after the children were removed from her home. The mother also failed to comply with subsequent nonreunification case plans developed by DFCS. Furthermore, since January 2000, her financial support for the children has been limited to purchasing clothing and giving them a "little money" and gifts.
The record shows that the mother steadfastly refused to cooperate with DFCS and gave her children only minimal financial support. This evidence, as well as testimony regarding the condition of the children and their home when DFCS removed them, provides clear and convincing proof that their deprivation resulted from a lack of proper parental care and control.[12]
*923 (c) Past deprivation, alone, cannot support a termination order.[13] The juvenile court, however, "`can consider a parent's past conduct in determining whether such conditions of deprivation are likely to continue.'"[14]
In this case, the mother failed to cooperate with DFCS because she did not believe the agency had jurisdiction over her or her children. And, in papers filed with the court, she questioned the State's authority to interfere with her child-rearing methodswhatever those methods may be. Although she promised at the termination hearing to work with DFCS, comply with the case plan, and keep her children in school, "[t]he decision as to a child's future must rest on more than positive promises which are contrary to negative past fact."[15] Based on the mother's prolonged refusal to cooperate, and her stated belief that she should be able to raise her children as she "see[s] fit," the juvenile court was authorized to conclude that the deprivation is likely to continue, despite her promises.[16]
(d) The record shows that the mother failed to enroll the two older children in school, and they could not read a complete sentence when removed from her home. Although the nine-year-old child could "pick out small words," the seven-year-old child could not. In short, the mother completely neglected her children's educational needs. Since entering foster care in January 2000, however, the children have attended school and, through hard work, have made remarkable progress. Under these circumstances, the juvenile court properly concluded that the continued deprivation likely will cause them "serious physical, mental, emotional, or moral harm."[17]
2. Finally, "`[t]he same factors that show parental misconduct or inability can support a juvenile court's finding that termination of parental rights is in the (children's) best interest(s).'"[18] Given the mother's refusal to cooperate with DFCS, her belief that the State lacks authority over her, the children's condition when removed from her home, and their significant progress in foster care, the juvenile court was authorized to conclude that termination will serve their best interests.[19]
Judgment affirmed.
BARNES and ADAMS, JJ., concur.
NOTES
[1] The juvenile court also terminated the parental rights of the children's putative fathers. Because the putative fathers have not appealed that ruling, we do not address the termination of their rights.
[2] See In the Interest of R.L.K., 255 Ga.App. 567, 568, 565 S.E.2d 880 (2002).
[3] (Punctuation omitted.) Id.
[4] (Punctuation omitted.) Id.
[5] (Punctuation omitted.) In the Interest of D.F., 255 Ga.App. 153, 564 S.E.2d 767 (2002).
[6] Id.
[7] Although the original reunification plan does not appear in the record, Waters testified about its requirements.
[8] See OCGA § 15-11-94(b)(4)(A)(i-iv).
[9] See In the Interest of D.F., supra at 156, 564 S.E.2d 767; see also OCGA § 15-11-2(8)(A) ("`Deprived child' means a child who ... [i]s without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health or morals.").
[10] See In the Interest of R.L.K., supra at 568-569, 565 S.E.2d 880; OCGA § 15-11-94(b)(4)(C)(iii).
[11] See id.; OCGA § 15-11-94(b)(4)(C)(ii).
[12] See In the Interest of D.F., supra; In the Interest of R.W., 248 Ga.App. 522, 525-526(2), 546 S.E.2d 882 (2001); In the Interest of F.C., 248 Ga.App. 675, 677-678(1), 549 S.E.2d 125 (2001).
[13] See In the Interest of R.W., supra at 524(1), 546 S.E.2d 882.
[14] Id.
[15] (Punctuation omitted.) In the Interest of K.S., 250 Ga.App. 386, 389, 552 S.E.2d 441 (2001).
[16] See id.; see also In the Interest of J.J., 259 Ga.App. 159, 165, 575 S.E.2d 921 (2003) (juvenile court's conclusion that deprivation is likely to continue bolstered by evidence that "mother did not take responsibility for her children's being in foster care and, instead, blamed [DFCS] for her circumstances, even while she herself has made practically no effort to address her problems and follow the steps outlined in the reunification case plan"); In the Interest of J.S., 232 Ga.App. 876, 880(1), 502 S.E.2d 788 (1998) (juvenile court may "assign less weight to `assertions of sudden parental fitness' based on belated efforts to comply with a case plan after termination proceedings begin").
[17] OCGA § 15-11-94(a)(4)(A)(iv); see also In the Interest of R.W., supra at 525, 546 S.E.2d 882.
[18] In the Interest of J.J., supra at 166, 575 S.E.2d 921.
[19] See id.; In the Interest of R.W., supra.