A03A1865. IN THE INTEREST OF K. N. C. et al., children.
(590 SE2d 792)

RUFFIN, Presiding Judge.

The juvenile court terminated the natural mother's parental rights to W. J. C., her thirteen-year-old son, and K. N. C., her six-year-old daughter. The mother appeals, arguing that the juvenile court lacked subject matter jurisdiction over the proceeding, erroneously failed to continue the termination hearing, and considered improper evidence. She further contends that the clear and convincing evidence does not support the termination order. For reasons that follow, we affirm.

In reviewing a parent's challenge to the sufficiency of the evidence in a termination proceeding, "we view the evidence in a light most favorable to the juvenile court's ruling and determine whether a rational trier of fact could have found by clear and convincing evi-

dence that the parent's rights should have been terminated."[1] In making this determination, we do not weigh the evidence or resolve credibility disputes, but defer to the juvenile court's factual findings.[2]

Viewed in this manner, the record shows that the children's father died in 1996. In October 1998, the children's paternal grandmother reported to authorities that the mother was acting violently toward the children. The juvenile court entered an emergency shelter care order on October 30, 1998, placing the children in the temporary emergency custody of the grandmother. Almost one month later, the court found the children to be deprived, awarded temporary custody to the grandmother, and established a visitation schedule for the mother. The mother apparently did not appeal the deprivation order.

Over the next few years, the court extended its custody order several times, noting that remaining in the grandmother's custody would be in the children's best interests. On May 31, 2000, the grandmother petitioned the juvenile court to terminate the mother's parental rights. In support of the petition, the grandmother alleged that the mother:

> has not lived with the children since October 1998 and has not contributed to their support since October 1998. The mother is currently incarcerated, and unable to provide for their basic necessities. The last time the mother saw the children was January 1, 2000, and her visitation with the children since October 1998 has been sporadic. Since October 1998 the mother has had multiple arrests and incarcerations including, but not limited to, violence in her residence involving family members in which the children were present. The mother has another child who has been removed from her custody by the Walton County Department of Family and Children Services. The contact the children have with their mother is detrimental to them as the mother's contact with the children results in emotional difficulties for the children and acting out behavior by the children.

The juvenile court denied the petition in an order filed March 21, 2001, concluding that termination of parental rights "at this time is not in the best interests of the children." The court noted that the mother, who has a substance abuse problem, had completed anger management classes, as well as an alcohol assessment and treatment program. It further found that the mother was attending Alcoholics Anonymous on a regular basis, was employed, and had her own hous-

---

[1] *In the Interest of T. W.*, 255 Ga. App. 674, 677 (566 SE2d 405) (2002).
[2] See *In the Interest of D. F.*, 255 Ga. App. 153 (564 SE2d 767) (2002).

ing. Finally, the court determined that, although the mother had pled guilty to aggravated assault, she was on probation and had completed the majority of the community service required by her probation conditions.

The following February, the grandmother again petitioned to terminate the mother's parental rights. The grandmother alleged that, since the court's previous order, "the mother has been rearrested and is currently incarcerated. . . . Furthermore, [she] promises the children things with which she cannot and does not follow through." On March 18, 2002, the juvenile court held a hearing on the second petition.

Dr. Paul Cardozo, the children's psychologist, testified that after the first termination proceeding, he supervised several visits between the mother and the children. During the visits, W. J. C. was "a little . . . disinterested." And although six-year-old K. N. C. was excited to see her mother, she began to misbehave and rebel against her grandmother following visits and telephone conversations with the mother. Dr. Cardozo noticed that the mother often talked about how she and K. N. C. would be together again. He grew concerned about these discussions, fearing that the mother was making promises she could not keep, setting K. N. C. up for disappointment, and damaging K. N. C.'s relationship with her grandmother. Dr. Cardozo also noted that several letters sent by the mother to the children undermined the grandmother's authority and blamed other people for her problems.

The grandmother testified that, after the first termination proceeding, she took the children to visit their mother every two to three weeks. On one occasion, she and the children arrived at the mother's home and discovered that the mother had moved. They did not know the mother's new address until the following week, when the mother called the children. The grandmother further testified that she smelled alcohol on the mother during two of the visits, and another witness, the mother's niece, asserted that the mother appeared high when the niece saw her in December 2001. The mother also admitted to drinking on at least one occasion in 2001.

The grandmother has financially supported and provided for the children since she obtained custody in 1998. During that time, the mother has contributed only $50 toward their support and has purchased each of them one piece of clothing. According to the grandmother, the children are doing well in school, are "settled" in her home, and are happy.

At the time of the hearing, the mother had been incarcerated in the Walton County jail for three months on charges of driving after being declared a habitual violator and driving under the influence of alcohol. Another county also had a "hold" on her for a probation viola-

tion. When arrested, she and her boyfriend were living with her mother because they could not afford to live elsewhere. In the months prior to her arrest, they had lived in two other places, but left one because they were behind on the rent and the other because they failed to pay the electric bill.

The mother's sister explained that the mother could not afford housing because she did not have a job. The evidence shows that, although the mother was employed during the prior termination proceeding, she quit that job because of personality conflicts with her supervisor. According to the mother, she did not receive a paycheck in 2001. Occasionally, however, she obtained work cleaning houses.

The mother's sister also testified that their own mother, with whom the mother and boyfriend lived, has an "ungodly" temper, and when her sister "gets up there around [their] mom . . . there's a lot of stress." Finally, a case manager with the Department of Family and Children Services ("DFCS") testified that DFCS had removed the mother's third child, J. P., from her custody on three occasions and, at the time of the second termination hearing, had proposed a nonreunification case plan for J. P.

The children's guardian ad litem, who has represented the children since 1998, recommended termination. The guardian noted that, during the previous termination hearing, he recommended that the mother's rights *not* be terminated. Given her use of alcohol since that time, her failure to obtain adequate housing, and her current legal troubles, however, he concluded that the mother's pattern of bad decision-making had "become a way of life." The juvenile court agreed and terminated her parental rights.

1. The mother first argues that the juvenile court lacked jurisdiction to hear the grandmother's termination petition. She contends that the petition is actually a disguised custody dispute. According to the mother, the grandmother in this case is analogous to a parent, and " 'when a deprivation action is between parents, it is prima facie a custody matter.' " Citing OCGA § 15-11-28 (c), she thus claims that jurisdiction only lies in the juvenile court following a transfer from the superior court, which has not occurred here.[3] We disagree.

Even assuming, without deciding, that the grandmother could be viewed as a parent, the mother's argument fails. Our Supreme Court has explicitly rejected the idea that we must regard any deprivation or termination action between parents as a prima facie custody dis-

---

[3] OCGA § 15-11-28 (c) provides that "[w]here custody is the subject of controversy, . . . in the consideration of these cases the juvenile court shall have concurrent jurisdiction to hear and determine the issue of custody and support when the issue is transferred by proper order of the superior court."

pute.[4] On the contrary, it has found only that "juvenile courts should not entertain deprivation proceedings brought by a *non-custodial parent to obtain custody* from a custodial parent."[5]

This is not a custody dispute. Despite the mother's claims, the grandmother is not trying "to wrest custody away from [her]." In fact, the grandmother has had custody of the children since 1998. It follows that the juvenile court properly exercised jurisdiction over the grandmother's termination petition.[6]

2. In her second enumeration of error, the mother argues that the juvenile court erred in denying her motion to continue the termination proceeding pending a competency determination. At the termination hearing, the mother presented evidence from Dr. Teresa Sapp, a forensic psychologist who evaluated the mother for competency in connection with her criminal charges. During the evaluation, which took place seven days before the termination hearing, Dr. Sapp found that the mother was confused as to the workings of the court, had difficulty concentrating, and could not recall why she was incarcerated.

Based on these findings, Dr. Sapp advised the mother's criminal attorney that, in her opinion, the mother was not competent to stand trial for the criminal charges and should be evaluated further. Dr. Sapp also testified, however, that her evaluation only related to the criminal proceeding, that she had not spoken with the mother since the evaluation, and that she would need to perform another evaluation to determine whether the mother was competent to participate in the termination hearing.

Following Dr. Sapp's testimony, the mother was questioned regarding her competency. According to the mother, she realized that, if her parental rights were terminated, she would never again be able to see her children. She recognized the grandmother, as well as the grandmother's attorney, recalled her previous appearance before the juvenile court and the result of that proceeding, knew why she was currently incarcerated, and testified about her living arrangements before her incarceration. She also recognized the juvenile court judge and described his role in the proceeding. Finally, she testified that she understood the proceedings, and she acknowledged that, although she hoped she might be awarded some visitation privileges, the juvenile judge could prohibit her from having any contact with the children.

---

[4] See *In re M. C. J.*, 271 Ga. 546, 549 (523 SE2d 6) (1999).

[5] (Punctuation omitted; emphasis in original.) Id. at 548.

[6] See OCGA § 15-11-28 (a) (2) (C) (except where termination petition is filed in connection with adoption proceedings, juvenile court has exclusive original jurisdiction over actions involving termination of parental rights).

Based on this evidence, the juvenile court refused to continue the hearing. We find no error. A motion for continuance, even one relating to competency, " 'is addressed to the sound discretion of the trial court, and this court will not interfere unless it is clearly shown that the court abused its discretion.' "[7] Given the mother's testimony, as well as the limited nature of Dr. Sapp's competency evaluation, the trial court did not abuse its discretion in denying the mother's motion.

3. Next, the mother argues that the juvenile court relied upon improper evidence in rendering its decision. Specifically, she claims that the judge considered irrelevant evidence presented in a matter involving J. P., the mother's third child. She further contends that the juvenile judge permitted Dr. Cardozo and the DFCS case manager to provide hearsay testimony.

(a) With respect to the relevancy claim, the juvenile court noted when discussing the competency issue that the mother had recently testified at a hearing involving J. P. Nothing in the record, however, indicates that the mother's testimony during that proceeding factored into the court's ruling on the motion to continue. Instead, the juvenile court focused on the testimony at the March 18, 2002 termination hearing. The mother also complains that the juvenile judge relied on irrelevant testimony from the DFCS case manager regarding DFCS's involvement with J. P. The mother's conduct toward J. P., however, is relevant to whether the deprivation of K. N. C. and W. J. C. is likely to continue.[8]

(b) The mother argues that the juvenile judge improperly allowed both the DFCS case manager and Dr. Cardozo to give hearsay testimony. But the juvenile court sustained the mother's hearsay objection during the case manager's testimony. And in the hearsay discussion relating to Dr. Cardozo, the juvenile court stated: "Let the record reflect . . . that I will not give any weight or credence to any hearsay testimony regardless of whether or not it's objected to. So I'll give no weight to any hearsay testimony."

"The [juvenile] judge is presumed to know the law and to be capable of separating admissible grains of evidence from inadmissible chaff."[9] Here, the judge explicitly stated that he would not consider any hearsay testimony. Accordingly, this enumeration of error lacks merit.[10]

---

[7] *Gignilliat v. State*, 196 Ga. App. 773 (2) (397 SE2d 52) (1990). See also *Pulliam v. State*, 236 Ga. 460, 461-462 (224 SE2d 8) (1976).

[8] See *In the Interest of T. L. H.*, 240 Ga. App. 201, 203 (523 SE2d 50) (1999).

[9] *Rowe v. Rowe*, 195 Ga. App. 493, 494 (2) (393 SE2d 750) (1990).

[10] See *In the Interest of O. J.*, 257 Ga. App. 1, 3-4 (2) (570 SE2d 79) (2002).

4. Finally, the mother asserts that the evidence does not support the termination of her parental rights. Again, we disagree.

Before terminating parental rights, the juvenile court conducts a two-step inquiry. First, it must determine whether there is "clear and convincing evidence of parental misconduct or inability."[11] Such misconduct or inability exists when: "(1) the child is deprived; (2) [the] deprivation is caused by the lack of proper parental care or control by the parent in question; (3) the deprivation is likely to continue; and (4) the continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child."[12] If the juvenile court finds parental misconduct or inability, it must then determine whether termination "is in the best interest of the child, after considering the physical, mental, emotional, and moral condition and needs of the child who is the subject of the proceeding, including the need for a secure and stable home."[13]

On appeal, the mother does not challenge the juvenile court's conclusion that the children are deprived, that the deprivation resulted from a lack of parental care and control, and that continued deprivation will or is likely to harm the children. Rather, she claims that clear and convincing evidence does not support a finding that (a) the cause of the deprivation is likely to continue or will not likely be remedied, and (b) termination is in the best interests of the children.

(a) In determining whether the deprivation is likely to continue, the juvenile court can consider the mother's past conduct.[14] As noted by the mother, at the prior termination proceeding, the juvenile court refused to terminate her parental rights and found that she had made significant progress toward reunification. She thus argues that the evidence supports a finding that the deprivation will *not* continue.

By the time of the second termination hearing, however, the mother had quit her job, failed to secure other stable employment, and moved several times because she could not afford housing. She also was arrested, jeopardized her probation, and began drinking again. We note that the mother invoked her Fifth Amendment right against self-incrimination when asked whether she was drinking on the day police arrested her for driving under the influence. But "inferences can be drawn from [the mother's] invocation of [her] privilege against self-incrimination [in a civil action], and . . . such inferences may constitute admissions unfavorable to [her]."[15] The evi-

---

[11] (Punctuation omitted.) *In the Interest of T. W.*, supra at 676.
[12] (Punctuation omitted.) Id.
[13] (Punctuation omitted.) Id. at 676-677.
[14] *In the Interest of D. F.*, supra at 156.
[15] *Sanders v. State of Ga.*, 259 Ga. App. 422, 426 (2) (577 SE2d 94) (2003).

dence further shows that, during the three years K. N. C. and W. J. C. lived with their grandmother, the mother contributed virtually nothing to their financial support. Moreover, DFCS had recently proposed a nonreunification plan for the mother's third child, J. P., and the children's guardian ad litem recommended termination.

This clear and convincing evidence supports a finding that the children's deprivation is likely to continue and will not be remedied.[16] Although the mother urges this Court to "look forward to a time when the [mother's problems] will no longer be present in [her] life," decisions regarding the children's "future must rest on more than positive promises that are contrary to negative past fact."[17]

(b) We also find sufficient evidence to support the juvenile court's conclusion that termination is in the children's best interests. In making this determination, the juvenile judge may consider the children's " 'need for a stable home environment and the detrimental effects of prolonged foster care. Children need permanence of home and emotional stability or they are likely to suffer serious emotional problems.' "[18]

The evidence shows that both children are doing well with the grandmother, who would like to adopt them. Dr. Cardozo also testified that the mother's contact with K. N. C. has been detrimental, leading to misbehavior. And although he did not make the same finding as to W. J. C., the factors that show the mother's parental inability and misconduct also support the conclusion that termination would be in the best interests of both children.[19] Accordingly, the juvenile court did not err in finding clear and convincing evidence supporting termination.[20]

*Judgment affirmed. Smith, C. J., and Miller, J., concur.*

DECIDED DECEMBER 1, 2003.

*Sheryl D. Fambrough*, for appellant.
*Tony D. Coy*, for appellee.

---

[16] See *In the Interest of K. S.*, 258 Ga. App. 24, 27-28 (572 SE2d 710) (2002); *In the Interest of D. F.*, supra; *In the Interest of T. L. H.*, supra.

[17] *In the Interest of T. W.*, supra at 677 (2).

[18] *In the Interest of D. F.*, supra at 157.

[19] See id.; *In the Interest of P. O. M.*, 255 Ga. App. 534, 536 (3) (566 SE2d 334) (2002).

[20] See *In the Interest of K. S.*, supra.