**FIFTH DIVISION**
**BROWN, C. J.,**
**RICKMAN, P. J., and MERCIER, J.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**April 23, 2026**

# In the Court of Appeals of Georgia

A26A0173. IN THE INTEREST OF A. A., et al., CHILDREN
    (FATHER).
A26A0174. IN THE INTEREST OF A. A., et al., CHILDREN
(MOTHER).

MERCIER, Judge.

Following the juvenile court's order discontinuing reunification services and recommending the future termination of their parental rights as part of a permanency plan, Thomas Altman and Kathleen Altman, the mother and father of two minor children, A. A. and B. A., appeal, contending that the evidence was not sufficient to show that A. A. had been subjected to chronic physical abuse under their care. For the reasons set forth below, we affirm.

As a general matter, when a party appeals an order discontinuing reunification services, we construe the evidence in the light most favorable to the juvenile court's

judgment and factual findings. See *In the Interest of C. P.*, 291 Ga. App. 699, 699–700(1) (662 SE2d 802) (2008). Viewed in this light, the record shows that A. A. was born on September 28, 2024. A. A. and his older brother, B. A., lived in a home with their parents and their maternal grandmother. No evidence was presented that anyone other than these three adults cared for the children. In November 2024, A. A.'s parents sought treatment for him because he was suffering from injuries to his legs. Doctors examined A. A., and they discovered that the baby had twelve bone fractures across his body, all in various stages of healing. Specifically, A. A. had a fracture in his left arm, two in his right arm, two in his left leg, and seven in his right leg. In two of these instances, bones had become completely detached from each other.[1] Dr. Emmanuel Pena, an expert in child abuse pediatrics, concluded that A. A.'s injuries resulted from simultaneous pulling and twisting that indicated the baby had been abused repeatedly.

---

[1] A. A. required surgery, the implantation of pins, and casts to promote healing. Even with this medical intervention, some evidence indicated that A. A.'s injuries might limit his ability to walk normally and play sports in the future.

Following the discovery of A. A.'s extensive injuries, both parents and the grandmother were arrested and incarcerated.[2] In addition, the Department of Family and Children Services ("DFCS") filed complaints regarding A. A. and B. A., and, on November 20, 2024, the juvenile court ordered that both children be placed in DFCS's custody and appointed a guardian ad litem. On November 27, 2024, DFCS filed a petition for dependency. Subsequently, on December 23, 2024, the juvenile court entered an Order of Adjudication and Temporary Disposition, finding that both children were dependent and abused,[3] and in need of court protection.[4] Thereafter, DFCS submitted a case plan that did not recommend or contain any reunification

[2] At the time of the juvenile court's ruling in this case, the mother and father were incarcerated with pending felony charges for two counts of aggravated battery, one count of cruelty to children in the first degree, and one count of cruelty to children in the second degree. The parents were also subject to bond conditions prohibiting any contact with A. A. and allowing only supervised contact with B. A. (if the parents were released from detention at some point in the future). The grandmother was also arrested, charged with the same crimes, and incarcerated.

[3] OCGA § 15-11-2(22)(A) defines a "dependent child" as one who "[h]as been abused or neglected and is in need of the protection of the court." OCGA § 15-11-2(2)(A) defines "abuse" as "[a]ny nonaccidental physical injury or physical injury which is inconsistent with the explanation given for it suffered by a child as the result of the acts or omissions of a person responsible for the care of a child[.]"

[4] The parents did not appeal this dependency order and are bound by it. See *In the Interest of J. S. G.*, 242 Ga. App. 387, 388(1) (529 SE2d 141) (2000).

services, and, on February 4, 2025, the juvenile court held a final disposition hearing at which it considered the recommendation for nonreunification. See OCGA § 15-11-204 (providing for nonreunification hearings).

At this hearing, the mother and father testified;[5] however, when asked any questions regarding the care of the children or the cause of A. A.'s injuries, both parents asserted their privilege against self-incrimination under the Fifth Amendment. See U.S. Const. Amend. V ("No person shall be ... compelled in any criminal case to be a witness against himself[.]"); Ga. Const. of 1983, Art. I, Sec. I, Par. XVI ("No person shall be compelled to give testimony tending in any manner to be self-incriminating."). Dr. Pena also testified extensively regarding A. A.'s multiple fractures. He opined that the injuries were the result of abuse that occurred on *at least* three occasions over A. A.'s seven weeks of life, and he cautioned that this was a very conservative estimate. In addition, he opined that B. A. was not the perpetrator of A. A.'s injuries. Dr. Pena determined that, instead, the bone fractures, which he referred

---

[5] The grandmother was not called to testify.

to as a "constellation of injuries," were caused by an adult handling the baby in an abusive manner.[6]

On March 6, 2025, the juvenile court entered an order of final disposition in which it approved a case plan of nonreunification (and future termination of parental rights). In support of nonreunification, the juvenile court found

> by clear and convincing evidence that a ground for termination of parental rights exists as the Mother and Father have subjected the Minor Children to aggravated circumstances. Aggravated circumstances means the parent has subjected a child or his or her sibling to torture, chronic abuse, sexual abuse, or sexual exploitation. OCGA § 15-11-2(5)(c). The [c]ourt finds by clear and convincing evidence that the parents subjected [A. A.] to chronic physical abuse.

The juvenile court concluded that, based on the evidence, a reunification case plan was not appropriate. Instead, the permanency plan was ordered to be adoption following the termination of parental rights.

In separate, but largely identical, appellate briefs, the mother and father now challenge this ruling, arguing that there is no clear and convincing evidence that either of them subjected A. A. to chronic abuse. In making this contention, the parents' argument is essentially two-fold: first, that there is no competent evidence that either

---

[6] Dr. Pena also ruled out medical causes for A. A.'s injuries.

of them actually caused A. A.'s injuries, and, second, that the injuries inflicted upon A. A. do not qualify as chronic abuse because they were not inflicted over a sufficiently lengthy period of time. We disagree on both counts.

When a juvenile court considers nonreunification, as in the present case, OCGA § 15-11-204(d) indicates that "DFCS [has] the burden of demonstrating by clear and convincing evidence that a reunification plan is not appropriate considering the health and safety of the child adjudicated as a dependent child and such child's need for permanence." In addition, there is "a presumption that reunification is detrimental to a child adjudicated as a dependent child and reunification services should not be provided if the court finds by clear and convincing evidence that ... [a] ground for terminating parental rights exists[.]" OCGA § 15-11-204(d)(3).

In turn, OCGA § 15-11-310(a) sets forth the grounds for terminating parental rights, and one such ground occurs when a "parent has subjected his or her child to aggravated circumstances[.]" OCGA § 15-11-310(a)(2). "Aggravated circumstances" exist if a parent, among other things, subjects "a child or his or her sibling to torture, chronic abuse, sexual abuse, or sexual exploitation[.]" OCGA § 15-11-2(5)(C).

6

1. With regard to their first argument regarding the state of the evidence, the parents are incorrect in their assertions that the juvenile court was not authorized to find that they were involved in the abuse and mishandling of A. A. The child had a dozen bone fractures caused within the first seven weeks of his life, he was housed with only his parents and maternal grandmother, an expert in child abuse pediatrics opined that the injuries were the result of child abuse caused by an adult, and the mother and father provided no explanation for the injuries that would negate the expert's opinion. Instead, the parents chose to assert their Fifth Amendment privilege every time they were asked about A. A.'s bone fractures, and there are detrimental consequences to the parents' decisions to do so. "[A]lthough a person does have a right to invoke the [Fifth Amendment] privilege in a civil case in order to protect himself, when [that person] does so, an inference against his [or her] interest may be drawn by the factfinder." *Sanders v. State*, 259 Ga. App. 422, 425(2) (577 SE2d 94) (2003) (punctuation omitted). Therefore, in this case, "inferences can be drawn from the [the parents'] invocation of [their] privilege against self-incrimination ..., and such inferences *may constitute admissions unfavorable to [them]*." *In the Interest of K. N. C.*, 264 Ga. App. 475, 481–482(4)(a) (590 SE2d 792) (2003) (punctuation omitted;

7

emphasis supplied). See also *In the Interest of R. D.*, 346 Ga. App. 257, 258 n. 2 (816 SE2d 132) (2018). Therefore, under these circumstances, the record and facts, when viewed in the light most favorable to the juvenile court's ruling, supports the finding that reunification was not warranted.[7]

2. The parents also maintain that the injuries sustained by A. A. cannot be considered to be "chronic abuse." More specifically, they argue that, given the short

---

[7] Expanding their sole enumeration of error in the arguments section of their briefs, both parents also contend that the juvenile court improperly premised the nonreunification decision on the parents' incarcerated status. While it is true that the juvenile court expressed concern about the parents' incarceration at the nonreunification hearing, the written order of the juvenile court properly premised nonreunification on its finding that the parents subjected A. A. to chronic abuse, not on the parents' incarceration. So, this contention brought by the parents is misplaced, as a juvenile court's oral pronouncements are not binding, and its written order controls. See *Titelman v. Stedman*, 277 Ga. 460, 461 (591 SE2d 774) (2003) (finding that "[w]hat the judge orally declares is no judgment until it has been put in writing and entered as such[,]" and quoting the Appellate Practice Act ("APA"), OCGA § 5-6-31, which provides, "[t]he filing with the clerk of a judgment, signed by the judge, constitutes the entry of the judgment" within the meaning of the APA) (punctuation omitted); *Burns v. State*, 313 Ga. 368, 375(3) n. 4 (870 SE2d 360) (2022)("[U]ntil an oral pronouncement is memorialized, the trial judge has broad discretion to amend, alter, or completely change his [or her] decision, and any discrepancy between the oral pronouncement and the written ruling will be resolved in favor of the written judgment.") (citation and quotation marks omitted.); *Mondy v. Magnolia Advanced Materials*, 303 Ga. 764, 772(4)(b) (815 SE2d 70) (2018) (a written order "trump[s] any implications that might otherwise be drawn from the bare oral ruling" when that ruling is reviewed on appeal).

length of A. A.'s life at the time that his injuries were discovered, the abuse did not occur over a long enough period of time to be considered "chronic." In other words, the parents appear to contend that seven weeks (the length of A. A.'s life when the injuries were discovered) is an insufficient amount of time for any abuse, no matter how recurrent, to qualify. Again, we disagree.

OCGA § 15-11-2(5)(C) does not define the term "chronic abuse,"[8] so we must turn to the rules of statutory construction. When we construe the language of a statute, "we must afford the statutory text its plain and ordinary meaning, we must view the statutory text in the context in which it appears, and we must read the statutory text in its most natural and reasonable way, as an ordinary speaker of the English language would." *Ware County Bd. of Educ. v. Taft*, 350 Ga. App. 848, 850 (830 SE2d 326) (2019). "[A]bsent clear evidence that a contrary meaning was intended by the legislature, words in a statute should be assigned their ordinary, logical and common meanings." *Glanton v. State*, 283 Ga. App. 232, 233–234 (641 SE2d 234)

---

[8] "Abuse," as noted above, is defined in OCGA § 15-11-2(2)(A) as "[a]ny nonaccidental physical injury or physical injury which is inconsistent with the explanation given for it suffered by a child as the result of the acts or omissions of a person responsible for the care of a child[.]" But the statute does not expressly define "chronic" or "chronic abuse."

(2007). With this in mind, "chronic" has been defined as "continuing or occurring again and again for a long time" or "always present or encountered[.]" Merriam Webster Online Dictionary (2026). It has also been defined as "constant; habitual; inveterate ... [or] continuing a long time or recurring frequently." Dictionary.com (2026). So, employing the definition of "abuse" given in OCGA § 15-11-2(2)(A), "chronic abuse" may be understood to mean, among other things, a constant, habitual, or always present nonaccidental physical injury.

These common definitions undercut the parents' argument that, because A. A. was only seven weeks old at the time that his injuries were discovered, he could not have been subjected to "chronic abuse." "Chronic" not only refers to something that recurs "for a long time," it also refers to conditions that are "always present," "constant," and "inveterate." Here, A. A. was subjected to twelve bone fractures from *at least* three instances of abusive handling in just his first seven weeks of life. Over this seven-week period, the abuse was both debilitating and *constant*, and, given the alarming frequency of abuse in this short period, we find no error in the juvenile court's determination that A. A. was subjected to the type of "chronic abuse" contemplated by OCGA § 15-11-2(5)(C). *Glanton*, 283 Ga. App. at 233–234.

In accordance with this finding, we also conclude that the juvenile court did not err in its determination that nonreunification of the minor children with the parents was not appropriate, as the parents chronically abused A. A.[9] *In the Interest of C.A.B.*, 347 Ga. App. 474, 479–480 (819 SE2d 916) (2018) (finding clear and convincing evidence to support the termination of a mother's parental rights on the statutory ground of aggravated circumstances due to abuse).

Therefore, for all of the reasons set forth above, we affirm the juvenile court's judgment.

*Judgment affirmed. Brown, C.J., and Rickman, P.J., concur.*

---

[9] We note that "aggravated circumstances" exist when the parent subjects the child *or the child's sibling* to abuse. See OCGA § 15-11-2(5)(C). Thus, the juvenile court was authorized to consider the parents' abuse of A. A. as evidence that they would not be able to properly care for B. A. See *In the Interest of S. B.*, 312 Ga. App. 180, 183-184 (1) (718 SE2d 49) (2011) (sexual abuse of older siblings allowed court to infer adverse effect on younger siblings and find children deprived).