A07A2184. IN THE INTEREST OF R. D. B., a child.
(656 SE2d 203)

SMITH, Presiding Judge.

The juvenile court terminated the natural mother's parental rights to her two-year-old son, R. D. B. The mother appeals, challenging the sufficiency of the evidence supporting termination, as well as the child's post-termination placement.[1] For reasons that follow, we affirm.

1. When reviewing an order terminating parental rights, we construe the evidence in the light most favorable to the juvenile court's ruling. *In the Interest of P. A. T. L.*, 264 Ga. App. 901 (592 SE2d 536) (2003). We do not weigh the evidence or resolve issues of witness credibility, but merely determine "whether any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody have been lost." (Citation omitted.) Id.

So viewed, the evidence showed that R. D. B. was born on November 13, 2004. Following the birth, both the mother and the

---

[1] The juvenile court also terminated the father's rights to R. D. B., but he is not a party to this appeal.

baby tested positive for methamphetamine, and R. D. B. was removed from the mother's custody on November 16, 2004. Although the child stayed briefly with his father, the Department of Family and Children Services ("DFACS") removed him in December 2004, and the juvenile court adjudicated him deprived based on the mother's substance abuse. R. D. B. was placed with foster parents, with whom he was still living when the juvenile court held a termination hearing approximately two years later.

DFACS developed a case plan for the mother, requiring her to obtain a substance abuse assessment and follow all treatment recommendations; complete a substance abuse treatment program; submit to random drug screens; remain drug free for six consecutive months; complete parenting classes; obtain a psychological evaluation and comply with treatment recommendations; maintain a source of income and suitable housing; and pay child support. The case plan also obligated the mother to attend all scheduled visits with her child and keep DFACS informed of any change in her address and telephone number. The juvenile court approved the case plan in January 2005.

In subsequent citizen panel reviews held in March and June 2005, the panel noted that the mother's whereabouts were unknown, she had not made progress on her case plan, and she failed to attend many of her scheduled visits with R. D. B. Then, on August 19, 2005, the mother was incarcerated for possession with intent to distribute methamphetamine, her second drug-related conviction. Although she received a ten-year sentence and was still incarcerated at the time of the termination hearing, she asserted that she might be eligible for release at "the end of 2007."

DFACS petitioned to terminate the mother's parental rights in May 2006. But prior to the termination hearing, the mother requested that R. D. B. be placed in the permanent custody of his maternal grandmother. At that point, DFACS attempted to withdraw the petition, recommending that custody be transferred to the grandmother. R. D. B.'s foster parents intervened, objected to the withdrawal, and were permitted by the juvenile court to pursue the termination petition.

The juvenile court held a termination hearing in December 2006. With respect to case plan goals, the evidence showed that although the mother claimed that she had received a substance abuse assessment in jail, she provided DFACS with no written documentation regarding the assessment or the treatment recommendations generated by it. She had also skipped approximately 50 percent of the drug screens required by DFACS, and the agency had no record that she took and passed six consecutive months of drug tests. Similarly, as of the hearing date, the mother had offered no proof to DFACS that she

had completed a parenting class or obtained the required psychological evaluation. The mother also had visited R. D. B. only sporadically before March 2005, did not visit thereafter, and had paid no child support for him.

Although the mother admittedly used drugs after R. D. B. was removed from her care, she asserted at the hearing that she was "ready to quit doing drugs" and had been drug-free since her incarceration. But she conceded that, despite abstaining from drugs while in prison following her first drug conviction, she had begun using again upon her release.

The mother became eligible for prison classes and programs in June 2006, and she reportedly took part in a substance abuse program, parenting class, and Narcotics Anonymous. The mother's prison counselor testified, however, that the mother had not yet completed the parenting class. And although the mother requested a psychological evaluation in prison, she had not been evaluated at the time of the hearing.

The mother lacked a bond with R. D. B., who was removed from her custody when he was three days old, and she wrote to his foster parents only once during her incarceration. Nevertheless, she testified that she wanted a chance to be with her child.

At the time of the hearing, R. D. B. had lived with the same foster family since he was ten days old. He calls his foster parents "mommy" and "daddy" and expresses love for them. The foster parents also love and wish to adopt R. D. B. The foster mother testified that R. D. B. suffers from fetal alcohol syndrome and has special needs, requiring extensive therapy, but is progressing with the help of his therapists and foster parents.

Before terminating parental rights, a juvenile court must (1) find present clear and convincing evidence of parental misconduct or inability and (2) conclude that termination is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition and needs. OCGA § 15-11-94 (a); *In the Interest of P. A. T. L.*, supra, 264 Ga. App. at 902 (1). To find parental misconduct or inability, the juvenile court must conclude that:

> (1) the child is deprived; (2) the deprivation is caused by lack of proper parental care or control; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation will likely cause serious physical, mental, emotional, or moral harm to the child.

(Citations omitted.) Id. at 902-903 (1).

On appeal, the mother focuses on only two of these required findings, asserting that the juvenile court erred in concluding that

the cause of R. D. B.'s deprivation is likely to continue and will result in serious physical, mental, emotional, or moral harm to the child. We disagree.

Despite the mother's recent efforts to meet *some* of her case plan goals, she completely failed to satisfy other case plan requirements. We recognize that she has had difficulty attaining certain goals while in prison. But she made no progress on the case plan during the eight months between R. D. B.'s removal and her incarceration. Moreover, she has shown little or no interest in creating or maintaining a bond with R. D. B., who was removed from her care just days following his birth, after both he and the mother tested positive for methamphetamine. The mother has provided no financial support for R. D. B. and visited him only sporadically until he was four months old, at which point the visits stopped. She also continued using drugs, resulting in her August 2005 incarceration.

Although incarceration alone does not compel termination, it will support a termination finding when combined with other circumstances. *In the Interest of P. A. T. L.*, supra, 264 Ga. App. at 903 (1). Given the evidence presented, including the mother's prison sentence, past history of drug use, failure to comply with case plan goals both before and during her incarceration, lack of parental bond with R. D. B., and failure to support her child, the juvenile court was authorized to conclude that the deprivation in this case is likely to continue. See *In the Interest of T. A. M.*, 280 Ga. App. 494, 498 (2) (634 SE2d 456) (2006); *In the Interest of P. A. T. L.*, supra, 264 Ga. App. at 904 (1).

The record also supported a determination that continued deprivation is likely to cause R. D. B. serious physical, mental, emotional, or moral harm. The child has been in foster care virtually his entire life, living with foster parents who love him, desire to take on the challenge of his special needs, and wish to adopt him. In contrast, R. D. B. does not know his mother, has no bond with her, and has not seen her since he was four months old. Furthermore, following her August 2005 incarceration, the mother sent only one letter to R. D. B.'s foster parents, which she mailed just four weeks before the hearing. This lack of interest, as well as the mother's history of drug use, incarceration, and failure to meet case plan goals, further authorized the juvenile court's conclusion that continued deprivation will harm R. D. B. *In the Interest of T. A. M.*, supra, 280 Ga. App. at 498 (2); *In the Interest of P. A. T. L.*, supra, 264 Ga. App. at 904 (1); *In the Interest of K. S. K.*, 253 Ga. App. 78, 80 (557 SE2d 494) (2001).

2. After terminating the mother's parental rights, the juvenile court held a hearing to address placement. The foster parents requested that R. D. B. be placed with them for adoption, and the child's

maternal grandmother also sought custody. The juvenile court ultimately gave custody to the foster parents, and the mother challenges this placement on appeal.

The evidence presented at the placement hearing showed that the grandmother has guardianship of R. D. B.'s two siblings, who live with her and her husband. Although the grandmother testified that she would like to adopt or have permanent custody of R. D. B., she refused to take custody of him on at least one occasion shortly after his birth, and she made few inquiries about his welfare before the termination proceedings began.

The grandmother has various health problems, including hypertension and high cholesterol, and she has suffered two heart attacks. Despite these problems, DFACS investigated the grandmother's home and found it suitable for R. D. B. The grandmother conceded, however, that she omitted certain expenses from the budget she provided DFACS, potentially wiping out much of the monthly financial surplus she had initially reported.

The evidence further demonstrated that R. D. B. did not know his grandmother, and she was not aware of the routine the foster parents used in addressing his special needs. In contrast, R. D. B. enjoyed a bond with his foster parents, and he was very clingy and broke out in hives after a DFACS caseworker took him to meet the grandmother.

A psychologist who assessed the grandmother's parental fitness testified that the grandmother and her husband interacted appropriately with R. D. B. during the assessment, and R. D. B. did not appear apprehensive or afraid while with them. The psychologist also testified, however, that R. D. B. might suffer trauma if removed from his foster parents' home and placed with the grandmother. Similarly, a psychotherapist stated that R. D. B. might develop reactive attachment disorder if removed from his foster parents, potentially causing problems with aggression.

The child's guardian ad litem ultimately recommended that R. D. B. be placed permanently with the foster parents. The juvenile court followed this recommendation, finding such placement appropriate and in the best interest of the child.

Under OCGA § 15-11-103 (a) (1), a court that has terminated the natural parents' rights to a child should

> first attempt to place the child with a person related to the child by blood or marriage or with a member of the child's extended family if such a person is willing and . . . is found by the court to be qualified to receive and care for the child, *if the court determines such placement is the most appropriate for and in the best interest of the child.*

(Emphasis supplied.)

Although the statutory framework encourages relative placement, it is not an absolute requirement. See *In the Interest of S. K.*, 248 Ga. App. 122, 129 (3) (545 SE2d 674) (2001); OCGA § 15-11-103 (b) ("A placement may be made under the terms of this Code section only if the court finds that such placement is in the best interest of the child."). Relatives receive no conclusive preference, and "the juvenile court is afforded wide discretion to determine whether a child should be placed with a relative or kept in a stable foster home." (Citation omitted.) *In the Interest of K. W.*, 283 Ga. App. 398, 402-403 (2) (641 SE2d 598) (2007).

Among other things, the juvenile court was authorized to find that, prior to the termination proceedings, the grandmother made little effort to connect with R. D. B., had previously refused to take custody of him, had health problems, lacked complete knowledge of R. D. B.'s special needs, and failed to fully disclose her family's financial circumstances during the DFACS home study. It could further conclude that R. D. B. has lived with his foster parents his entire life, has bonded with them and views them as his parents, may suffer trauma if removed from their home, and has progressed developmentally in their care. Accordingly, the juvenile court did not abuse its discretion in permanently placing R. D. B. with his foster parents. See *In the Interest of K. W.*, supra, 283 Ga. App. at 403 (2); *In the Interest of S. S.*, 267 Ga. App. 601, 603 (600 SE2d 679) (2004).

3. Finally, the mother argues that the juvenile court erred in failing to assess the impact of separating R. D. B. from his siblings and in refusing to allow the grandmother to visit with the child. Again, we disagree.

(a) The parties informed the juvenile court that R. D. B.'s siblings lived with the grandmother, and the record does not indicate that the court ignored this fact. Moreover, although a juvenile court should consider possible placement with siblings in its determination, nothing *requires* that a child be placed with a brother or sister. See *In the Interest of S. V.*, 281 Ga. App. 331, 333 (2) & n. 1 (636 SE2d 80) (2006). Finally, the mother offered no evidence that R. D. B. enjoyed any relationship with his siblings or had ever met them. Given the evidence presented, the juvenile court did not abuse its discretion in determining that the other factors supporting placement with the foster parents outweighed any consideration of the siblings. See id.

(b) The record shows that on August 1, 2006, months after the termination petition was filed and at the guardian ad litem's request, the juvenile court preliminarily prohibited visitation between the grandmother and R. D. B. The court subsequently held an evidentiary hearing on the issue and reaffirmed this ruling, determining

that the parties should not "start this late in the game working on another bond . . . until we can establish where we need[ ] to go."

The mother argues that the juvenile court prevented the grandmother from establishing a bond with R. D. B. The court, however, did not impede the grandmother from seeking a bond with her grandchild before August 2006. And the mother has pointed to no authority requiring the juvenile court to permit such visitation, particularly given the guardian ad litem's request. Furthermore, the record does not contain a transcript of the visitation hearing, leading us to presume that the evidence supported the juvenile court's decision to deny visitation.[2] See *Farley v. Hawkins*, 277 Ga. App. 880, 881 (627 SE2d 913) (2006) (where appellant failed to include hearing of termination proceeding in appellate record, "we must assume that evidence supported the trial court's findings"). Under these circumstances, we find no error in the juvenile court's ruling.

*Judgment affirmed. Barnes, C. J., and Miller, J., concur.*

DECIDED DECEMBER 20, 2007.

*Sexton & Key, Dale T. Preiser,* for appellant.
*Crumbley & Harper, Jason T. Harper, Ann K. Miller, Leslie M. Gresham,* for appellee.

---

[2] As specified in the mother's notice of appeal, the appellate record includes the transcript of the termination proceeding. The notice of appeal, however, does not mention the visitation hearing, which was held before the termination proceeding, or request that the transcript of that hearing be included in the record.